IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

No. 6: 19-cr-03048-01/02-CR-S-BCW

TOMMY RAY GOSS and BONTIEA
BERNEDETTE GOSS

    *Defendants*.

## DEFENDANT TOM GOSS' SENTENCING MEMORANDUM

Comes now the Defendant, Tommy Ray Goss, by and through undersigned counsel, Christopher Plumlee and Wendy Johnson, who respectfully submit this Sentencing Memorandum in the above captioned matter, scheduled for sentencing April 24, 2024. For reasons stated herein, Mr. Goss respectfully requests the Court consider a sentence at or near the low end of the statutory range of punishment consisting of not more than 60 months for his conviction of conspiracy, in violation of 18 U.S.C. § 371, and not more than 36 months for his conviction of aiding and assisting in the preparation and presentation of a false income tax return, in violation of 26 U.S.C. § 7206(2), with any imposed sentence to run concurrently.

Mr. Goss also requests the Court assess a forfeiture amount not to exceed amounts further described within this Memorandum.

1

# TABLE OF CONTENTS

Table of Contents.............................................................................................2

Table of Authorities.........................................................................................4

Mr. Goss – Background And Overview.............................................................6

Sentencing Statutory And Legal Sentencing Considerations...........................6

Considerations Of Application Of Sentencing Guidelines.............................10

    A.    The guideline range is severely overstated.................................10

    B.    Need for just punishment in light of the seriousness of the offense...........10

    C.    Mr. Goss was not motivated by greed, but by his desire to help others........11

    D.    Mr. Goss's offense occurred during a time of profound personal tragedy...........14

    E.    Mr. Goss' conduct was aberrant....................................14

    F.    Need for deterrence....................................................15

    G.    Need to protect the public from future crimes by Mr. Goss - Mr. Goss has an exceptionally low risk of recidivism....................................16

    H.    Needed medical treatment in the most effective manner.................18

No Basis For A Joint Sentencing Hearing........................................................20

Method Of Evidence Presentation At Sentencing Hearing.............................21

Mr. Goss Is Responsible For Bribes To Hank Wilkins And Jon Woods.............21

    A.    Hank Wilkins and Jon Woods....................................21

    B.    More than one bribe....................................................22

    C.    Mr. Goss did not bribe Jeremy Hutchinson...................23

    D.    Hutchinson's legislative actions did not impact legislation in Arkansas.........26

    E.    Hutchinson's legislative actions did not negatively impact Arkansas Criminal Justice Reform.........................................................29

The Bribes To Lawmakers Did Not Result In More Than $11 Million In Revenue And $3 Million In Profit.......................................................32

Mr. Goss Should Not Receive A 4-level Adjustment For Leader/ Organizer.........36

Mr. Goss Should Be Held Responsible For Kickbacks Received Totaling $356,350...........38

Mr. Goss Did Not Steal Money Through An Alleged Scheme To Artificially Inflate Vehicle Leases.........................................................39

Mr. Goss Did Not Steal From The Non-profit By Causing The Improper Leasing And Sale Of Vacation Properties.......................................47

2

**Mr. Goss Did Not Steal Non-Profit Funds By Improperly Relying On The Use Of Charter Flights To/From Colorado. ....................................................................... 52**

**Mr. Goss Did Not Steal From The Non-profit Through The Payment Of Pro1 Warehouse Rent ................................................................................................................. 56**

**Mr. Goss Did Not Conceal The Theft Of Over $2 Million Dollars From The Non-Profit By David Hayes ................................................................................................... 59**

**The Court Should Consider Forfeiture In Lieu Of Restitution ............................. 63**

**Calculation Of Loss Caused By Mr. Goss .......................................................... 65**

## **TABLE OF AUTHORITIES**

### Cases

*Apprendi* v. *New Jersey,* 530 U.S. 466 (2000)............................................................................. 7
*Gall v. United States*, 128 S. Ct. 890 (2009)................................................................................ 7
*Kimbrough* v. *United States,* 552 U.S. 85 (2007) ....................................................................... 7
*Simon v. United States,* 361 F. Supp. 2d 35 (E.D.N.Y. 2005)................................................... 17
*United States v Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) ...................................................... 7
*United States v. Booker*, 534 U.S. 220, 259-60, 125 S.Ct. 738 (2005).................................... 7, 8
*United States v. Braggs*, 511 F.3d 808,812 (8th Cir. 2008)........................................................ 7
*United States v. Cabrera,* 567 F. Supp. 2d 271 (D. Mass. 2008) ............................................. 17
*United States v. Darway,* 255 Fed. Appx. 68 (6th Cir. 2007)................................................... 17
*United States v. Davis,* 2008 WL 2329290 (S.D.N.Y. June 5, 2008)........................................ 15
*United States v. Feemster*, 572 F.3d 455 (8th Cir. 2009) .......................................................... 7
*United States v. Gee,* 226 F.3d 885 (7th Cir. 2000).................................................................. 20
*United States v. Gray*, 2021 U.S. Dist. LEXIS 169799 .............................................................. 18
*United States v. Hadash,* 408 F.3d 1080 (8th Cir. 2005) .......................................................... 14
*United States v. Hamilton,* 323 Fed. Appx. 27 (2d Cir. 2009) ................................................ 17
*United States v. Howe,* 543 F.3d 128 (3rd Cir. 2008) .............................................................. 14
*United States v. Jennings*, 487 F.3d 564 (8th Cir. 2007).......................................................... 64
*United States v. Mahan,* 2007 WL 1430288, at *3 (10th Cir. 2007) ........................................ 11
*United States v. Martin,* 363 F.3d 25, 49-50 (1st Cir. 2004) ................................................... 20
*United States v. Milne,* 384 F. Supp. 2d 1309 (E.D. Wis. 2005).............................................. 11
*United States v. Nellum,* 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005)............................. 17
*United States v. Ovid,* slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) .................... 10
*United States v. Ranum,* 353 F. Supp. 2d 984 (E.D. Wis. 2005) ............................................. 11
*United States v. Ruelas-Mendez*, 556 F.3d 655 (8th Cir. 2009)................................................. 7
*United States v. Urbina,* slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009)................. 17
*United States v. Ward,* 814 F. Supp. 23 (E.D. Va. 1993).......................................................... 17
*United States v. Webber*, 2020 WL 6706346 (D.N.D., 2020) ................................................... 18
*United States v. Westmoreland*, 2023 U.S. Dist. LEXIS 7366 ................................................. 18
*Wisconsin v. Mitchell,* 508 U.S. 476 (1993) .............................................................................. 11

### Statutes

18 U.S.C. § 3553....................................................................................................................... 9
18 U.S.C. § 3553 (a) ........................................................................................................... 7, 8, 9
18 U.S.C. § 3553(a)(2)(D)......................................................................................................... 18
18 U.S.C. § 3661 ........................................................................................................................ 9
18 U.S.C. § 371 .................................................................................................................. 1, 65
18 U.S.C. § 666(a)(2)............................................................................................................... 65

26 U.S.C. § 7206(2) ................................................................................................................... 1

Rules

§ 1B1.5 ................................................................................................................................. 70
§ 2B1.1(b)(1) .............................................................................................................. 65, 69, 70
§ 2B1.1(b)(1)(C) ................................................................................................................ 2, 68
§ 2B1.1(b)(1)(J) ..................................................................................................................... 65
§ 2C1.1 ..................................................................................................................... 66, 70, 71
§ 2C1.1(b)(2) .................................................................................................................. 65, 66
§ 2C1.1(b)(2)(J) ..................................................................................................................... 65
U.S.S.G. § 1B1.5(b)(2) .......................................................................................................... 70
U.S.S.G. § 2B1.1 ................................................................................................................... 70
U.S.S.G. § 2C1.1 ............................................................................................................. passim
U.S.S.G. § 2C1.1(b)(1) ..................................................................................................... 22, 23
U.S.S.G. § 2C1.1(b)(2) ..................................................................................................... passim
USSG § 5H1.1 ....................................................................................................................... 17
USSG § 5Hl.4, p.s. (2010) .................................................................................................... 18

**Other Authorities**

*At a "Loss" for Justice: Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37
(2011) ............................................................................................................................. 10
*Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).......... 15
*Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment:*
*"Proportionality" Relative to What?",* 89 Minn. L. Rev.571, 590 (February 2005)...........11
*Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White*
*Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007)................................. 15, 16
*Follow-Up Audit of the Federal Bureau of Prisons' Efforts to Manage Inmate Health Care.*
U.S. Dept. of Justice, Office of Inspector General Audit Division, July 2010 Audit Report
....................................................................................................................................... 19
*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing*
*Guidelines* ..................................................................................................................... 16
*Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006) ................................ 15
Sent'g Comm'n, *Recidivism and the "First Offender,"* ............................................................ 16
*Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33
Criminology 587 (1995) ................................................................................................. 16
U.S. Dept of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of*
*Prison's Efforts to Manage Inmate Health Care* ii-xix, 32-34 (2008)................................. 19

**Mr. Goss – Background And Overview.**

Tommy Ray Goss (Mr. Goss) is a sixty-eight year old man who has spent his entire life bettering the lives of those around him. His early years were disrupted by an alcoholic and abusive father and at ten years old found himself living with a single-parent mother. Frequent moves throughout his childhood eventually led him to call Missouri and Arkansas home. From very early on, Mr. Goss was very protective of his mother and his brother, Ron, who is 5 years his junior. This protective nature, entrenched in his early years has stayed with Mr. Goss to this day. Instead of lamenting his troubled formative years, periods of homelessness, and times of profound loss, Mr. Goss has worked tirelessly to overcome and continues to do so even today. He has spent his life helping, mentoring, encouraging not only his family, but countless others who came into his life – many whose name he doesn't know. He has donated hundreds of thousands of dollars to those in need. He has helped to encourage and empower those with developmental disabilities, those suffering from addiction, and those that simply needed a helping hand.   Mr. Goss submits this sentencing memorandum to this honorable court in an attempt to 1) provide insight as to the man he is; 2) exhibit both acceptance, responsibility, and remorse for the criminal behavior to which he pled, and 3) explain why he disagrees with some of the government's allegations.

Mr. Goss has been under investigation in this matter for the better part of eight years. He has been under indictment and on pre-trial release in the state of Colorado for the past five years with absolutely no problems reported.  To date, Mr. Goss has not been afforded an opportunity to tell his side of the story. He seeks to do so now.

**Sentencing Statutory And Legal Sentencing Considerations.**

In *United States v. Booker*, the United States Supreme Court held that the guidelines set forth by the United States Sentencing Commission are not mandatory, but rather advisory. *United*

*States v. Booker*, 543 U.S. 220, 259-60, 125 S.Ct. 738 (2005). A "district court should begin [a sentencing proceeding] with a correct calculation of the [defendant's] advisory Sentencing Guideline range." *United States v. Braggs*, 511 F.3d 808,812 (8th Cir. 2008). "[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553 (a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. Further, the Supreme Court has made clear that District Courts have a tremendous amount of discretion when it comes to determining the sentence to be imposed in a federal criminal case. *See, e.g., Kimbrough* v. *United States,* 552 U.S. 85 (2007); *Gall,* 552 U.S. at 38; *Apprendi* v. *New Jersey,* 530 U.S. 466 (2000). Pursuant to this line of Supreme Court authority, while District Courts must consider, as a starting point, the applicable guideline range, they are perfectly free to then agree or disagree with that range, as they see fit. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the fact presented." *Id.*, (quoting *Gall v. United States*, 128 S. Ct. 586 (2009). The district court "has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) (quoting *United States v Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)) ("[I]t will be the unusual case when we reverse a district court sentence – whether within, above, or below the applicable Guidelines range – as substantively unreasonable."). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Braggs,* 511 F.3d at 812.

Pursuant to *Booker*, a sentencing court must correctly calculate and consider the applicable Guidelines range, but it has the freedom to tailor the sentence in light of other statutory factors.

*See* 18 U.S.C. § 3553(a); *see also Booker*, 125 S. Ct. at 757. Thus, under *Booker*, the sentencing court must treat the Guidelines as one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). As such, the advisory guideline range does not carry any greater weight or significance than any of the other factors to be considered.

The primary directive in § 3553(a) is for the sentencing court to impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes of sentencing. Under § 3553(a)(2), such purposes are:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense:

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider additional factors, including:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The kinds of sentences available;

3) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

4) The need to provide restitution to any victim of the offense.

Mr. Goss' Sentencing Memorandum sets forth the reasons a sentence at or near the low end of the statutory sentencing range is appropriate. This Sentencing Memorandum will also

8

show that a sentence at or near the low end of the statutory sentencing range meets the primary directive in 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Specifically, a sentence at or near the low end of the statutory sentencing range is sufficient to reflect the seriousness of his offenses, to promote respect for the law, and provide just punishment; afford adequate deterrence; and to protect the public from any future crimes he might commit.

*Post-Booker,* there is "[n]o limitation ... on the information concerning the background, character, and conduct of a [defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Therefore, Mr. Goss respectfully urges this Honorable Court to consider the information contained in the Presentence Report, the Objections to the Presentence Report, and this Sentencing Memorandum and Motion for Variance and impose a sentence at or near the low end of the statutory sentencing range. Mr. Goss asks the Court to fully examine all of his character traits and the circumstances surrounding his life, as discussed in the letters accompanying this filing, in addition to the instant offense when determining an equitable sentence in this case.

Mr. Goss respectfully urges this Court to find that a variance under 18 U.S.C. § 3553 is warranted as § 3553(a) instructs this court to impose a sentence "sufficient, but not greater than necessary." He respectfully requests mercy from this Court in light of his acceptance of responsibility, his background, character, and medical history. In support of his request, Mr. Goss relies on the particular facts in his case, the testimony of Steve Browne, CPA, ABV, CITP, CFE, CFF, David Kimbrough, former IRS Supervisory Special Agent, letters from individuals which describe Mr. Goss' character, the arguments set forth in this sentencing memorandum, and allocution statement provided to this court.

9

Finally, in formulating an appropriate sentence following consideration of all the factors described herein, Mr. Goss asks the Court to consider imposition of any sentence on the two counts to which he pleaded guilty be ordered to serve concurrently with each other.

## Considerations Of Application Of Sentencing Guidelines.

### A.  The guideline range is severely overstated.

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid,* slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."). A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guideline range.

### B.  Need for just punishment in light of the seriousness of the offense.

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences,*

*Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?",* 89 Minn. L. Rev.571, 590 (February 2005). The guidelines include none of the factors bearing on the degree of culpability of Mr. Goss.

### C. Mr. Goss was not motivated by greed, but by his desire to help others.

A defendant's motive is highly relevant at sentencing. *See Wisconsin v. Mitchell,* 508 U.S. 476,485 (1993); *United States v. Mahan,* 2007 WL 1430288, at *3 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, *i.e.,* that he had been violently beaten by three men and sought to defend his wife); *United States v. Milne,* 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Ranum,* 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (defendant did "not act for personal gain or for improper personal gain of another").

Mr. Goss has always been motivated by his desire to help others. For many years, he has financially helped individuals that were not part of immediate family – those extended family members, friends, acquaintances, and complete strangers whose situation Mr. Goss learned about and reached out, many times anonymously to meet immediate needs. (See Character Affidavits, Exhibits TG1-6; Letters of Character, Exhibits TG7 – 20; and List of Charitable Acts, TG-21). No scores were kept, no IOUs were taken. In fact, but for the fact the government insists on portraying Mr. Goss as - the kind of man who "… for (his) own enrichment… stole even more from the Non-profit, taking money away from the needed

services that the Non-profit purported to provide to the citizens not only of Arkansas, but Missouri," (Govt. Sent. Mem. Pg. 83) – Mr. Goss and his family would not speak of these many instances of giving to his fellow man.[1] However, it is so important that this Court see Mr. Goss, the entire man, and gain a glimpse of his life's work. Every Christmas, Mr. Goss and his wife Bontiea would sit with their children and ask them to think of people they knew, or organizations they were familiar with and determine what needs existed and what could be given to meet that need. Every year, Mr. Goss and his wife would donate in their children' names to those organizations and individuals – thousands and thousands of dollars over the past 20 years. They instilled in their children the spirit of "helping others."  Mr. Goss' investment, however, was not just financial, nor did it only manifest at Christmas. Over the course of his life, he has opened his home to countless young people who needed a stable home; he has paid for college and living expenses for many individuals; he has provided financial assistance to single mothers to help with sports fees, clothing, and school expenses for their children; he has paid for braces, repaired and purchased cars, bought clothes, furniture, and paid for counseling and recovery services. His financial assistance and guidance have allowed many, many individuals to gain their education and secure good paying jobs, leading to stability and well-being in their lives.

Mr. Goss and his wife have purchased computers for school libraries in Tibet and Costa Rica after traveling to those locations and seeing immediate needs. In 2012 – 2013, Mr. Goss' home was located on Wonderland Hills, in Boulder, Colorado. A homeless men's shelter was located nearby. Daily, he saw men walking to the Hills shelter to eat breakfast. Mr. Goss

---

[1] The government refers to AO/PFH as a "Charity". It is chartered under Internal Revenue Code Section 501(c)(3) as a tax exempt non-profit organization.

noticed their shoes – they were in terrible condition. Mr. Goss was a competitive, world class runner and he knew how important it was to have decent shoes. He purchased over 1,000 pair of tennis shoes, averaging $75 per pair – New Balance, Asics, and Nike and stored them in his attic. For over two years, he gave a few dozen pairs of shoes out each week, until he saw all the men walking by his house in good shoes. To this day, Mr. Goss continues to donate roughly 50 pairs of tennis shoes per year, now mostly Hoka's. He utilizes the donation box near the Walgreen's at 120th Ave, in Thornton, Colorado, near his current residence. This donation box is operated by The Colorado Adaptive Sports Foundation and accepts clothing and shoes.  Mr. Goss' lifestyle of compassion and generosity is outside the heartland of what could be considered normal charitable giving and we submit these examples show the Court the true character of Mr. Goss, one who is not defined solely by acts that brought him to this Court.  (See Exhibits TG-1 thru TG-20; TG-193).

Tom, along with his wife Bontiea and others who came to be known as the "Resource Team" began working towards bettering the lives of the developmentally disabled, the addicted, the "unemployable" in the early 1990s. Their hard work manifested in what was an award winning, 200 million dollar non-profit company that assisted, employed, trained and mentored countless thousands in Missouri, Arkansas, and elsewhere. There was a time, however that exceedingly poor decisions and bad judgment led to the blurring of lines, and eventually the commission of the crimes for which Mr. Goss has pled guilty. Mr. Goss is remorseful for having received the $356,350 from Cranford as kickbacks. While Mr. Goss understands he must be held accountable for his actions, this conduct does not define his character or the life he has lived. Aside from these funds, the government has failed to establish evidence that Mr. Goss stole or embezzled any other funds for personal use.

**D. Mr. Goss's offense occurred during a time of profound personal tragedy.**

On May 2, 2011, Mr. Goss lost his son, Alex to a drug overdose in Springfield, Missouri. Alex battled drug addiction throughout his teenage years, and Mr. Goss' last contact with Alex prior to his death was not positive. Following Alex' untimely death, Mr. Goss spiraled into a profound depression that he still experiences today. The years immediately after Alex' death were particularly dark, and Mr. Goss was prescribed psychotropic drugs to combat his severe depression.

This information is not offered as an excuse for Mr. Goss' conduct for which he pleaded guilty, but merely offer context and explain some of the reasons he could not bear to be in Springfield all of the time. Mr. Goss became detached from friends, family and coworkers during that period and struggles to discuss Alex' death today.

**E. Mr. Goss' conduct was aberrant.**

Mr. Goss has lived a law-abiding life until the instant offense. He was an active member of the community and a dedicated husband and father. He did not engage in criminal conduct until he became emotionally distraught over the loss of his son, Alex, endured a long period of staying heavily medicated, which affected his judgment. The offenses to which he pleaded guilty occurred not long after this tragic event. His offense is completely uncharacteristic when viewed in the context of his entire productive adult life. This Court should grant a variance based on the aberrant nature of his conduct. *See, e.g., United States v. Howe,* 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash,* 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis,* 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had

worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

### F. Need for deterrence.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." *Id.; see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both  the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id.*  at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  *Id.* at 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al., Specific*

*Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995); *see also* Gabbay, *supra,* at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

### G. Need to protect the public from future crimes by Mr. Goss - Mr. Goss has an exceptionally low risk of recidivism.

Mr. Goss is 68 years old, a first offender, a college and master's degree holder, has been employed throughout his adult life, has been married to his wife for twenty-two years, and has no history of drug or alcohol abuse. For all male offenders in Criminal History Category I, the recidivism rate is 15.2%. For those over age 50 at the time of sentencing, however, the rate in Category I is only 6.2%. For those who are college graduates, the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. Undoubtedly, for those like Mr. Goss who are educated, have been employed, have been married, are drug free and over 50, the combined rate is even lower. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism].*

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism* at 16 (noting that "[o]ffender age is a

pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines but has stated that age "may be relevant" in granting a departure. USSG § 5H1.1.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Goss, this Court should consider the statistically low risk of recidivism presented by Mr. Goss' history and characteristics. *See, e.g., United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton,* 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Urbina,* slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera,* 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States,* 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum,* 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense); *United States v. Webber*, 2020 WL 6706346 (D.N.D., 2020) (reducing sentence where Defendant's Personal history and

nonviolent offenses demonstrate a lack of future dangerousness.); *United States v. Westmoreland*, 2023 U.S. Dist. LEXIS 7366 (finding the defendant's advanced age mitigated the likelihood of recidivism, citing research on declining arrest rates in aging adults.); *United States v. Gray*, 2021 U.S. Dist. LEXIS 169799 (finding the 69-year old defendant's risk of recidivism was remote given low recidivism rates for prior offenders of advanced age and the defendant's lack of criminal history.)

      H.      **Needed medical treatment in the most effective manner.**

The sentence imposed must ensure that "needed ... medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The Commission now recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted," and has always recognized that "in the case of a seriously inform defendant, home detention may be as efficient as, and less costly than, imprisonment." USSG § 5Hl.4, p.s. (2010).

Mr. Goss' medical records were recently evaluated by Dr. Charles Howard, Former Medical Director, Miami Federal Detention Center, Miami, Florida. Dr. Howard evaluated the unique medical and mental health history of Mr. Goss through medical records provided to him and concluded that prolonged incarceration in the Bureau of Prisons presents a clear and substantial risk to his continued health. This is based in part on the presence of a heart arrythmia, susceptibility to infection-coupled with an immunity to most antibiotics, long Covid, serious chronic back and foot related issues and a concern that Mr. Goss would not receive the timely care necessary if he were faced with a serious or life threatening occurrence related to these conditions. (Letter from Dr. Howard, Exhibit TG-22). Also included are letters from medical providers which were previously submitted with Mr. Goss' PSR objections. (Doc. 322; See also Exhibits TG184 through TG-191).

While Dr. Howard suggests home detention as the best alternative, should the Court sentence Mr. Goss to the Bureau of Prisons, Dr. Howard recommends a request that Mr. Goss be designated as a CARE 4 inmate assigned to a Federal Medical Center where he may receive the appropriate care.

Dr. Howard's recommendation is based on concerns that Mr. Goss is not likely to receive effective medical care in a Bureau of Prisons facility. An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. It found that at a number of institutions, the Bureau of Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions, including diabetes. *See* U.S. Dept of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* ii-xix, 32-34 (2008), *available at* www.justice.gov/oig/reports/BOP/a0808/final.pdf. As a result of the above referenced audit, BOP's corrective actions resulted in improvements in its credentialing and peer review process, although, "additional improvements are needed to ensure that all of the BOP's health care providers are operating with current authorization documents and peer reviews." *Follow-Up Audit of the Federal Bureau of Prisons' Efforts to Manage Inmate Health Care.* U.S. Dept. of Justice, Office of Inspector General Audit Division, July 2010 Audit Report. https://oig.justice.gov/reports/BOP/a1030.pdf.

Further, as cited by Dr. Howard, requests by an inmate for medical care frequently take "weeks" to even receive a response. (Exhibit TG-22). Imprisonment without "the most effective" treatment is likely to further damage Mr. Goss' health and shorten his life

19

significantly. As soon as possible, he should be released to home detention with permission to attend medical appointments. *See United States v. Martin,* 363 F.3d 25, 49-50 (1st Cir. 2004) (upholding departure when **BOP** had policy of not administering the only medication successful in treating defendant's Crohn's disease); *United States v. Gee,* 226 F.3d 885, 902 (7th Cir. 2000) (finding no abuse of discretion where district court concluded BOP's letter stating its ability to handle  medical conditions of all kinds was merely a form letter and that imprisonment posed a substantial risk to the defendant's life).

## No Basis For A Joint Sentencing Hearing.

Since at least August 3, 2023, the government has known that this Court intends to conduct separate sentencing hearings for Mr. and Mrs. Goss. The government's objections to the Court's stated intentions were heard and the Court's ruling was entered. (Docs. #326,327, setting the sentencing hearings for December 14 15, 2023.) On November 2, 2023, the sentencing hearing were rescheduled to April 24th and 25th, 2024. (Docs. #332,333.) The government objected to separate sentencing hearings. The government also objected to the Court's briefing schedule, requesting that the parties file their sentencing memorandums at the same time. The government has been heard on the issues and the Court has made its ruling. Months of preparation, certainly for all parties, have taken place in the preparation for the upcoming sentencing hearings. Yet, in spite of the Court's previous ruling, the government devoted over three pages in its sentencing memorandum "reasserting" its objections and requesting the Court to change its ruling and hold a joint sentencing.  Mr. Goss is prepared to present evidence in the form of documents, affidavits and live testimony and requests that the Court's order, giving him that opportunity on April 23, 2024, remain.

**Method Of Evidence Presentation At Sentencing Hearing.**

The government devoted three pages of its sentencing memorandum to discuss the manner through which they plan to present their evidence at sentencing. Mr. Goss will be prepared to present evidence in the form of documents, affidavits, and live testimony. He will also be prepared to question the sufficiency of the government's evidence and make any appropriate challenges to its reliability. Mr. Goss expressly reserves the right to cross examine any government witnesses or authors of affidavits presented as evidence by the government.

**Mr. Goss Is Responsible For Bribes To Hank Wilkins And Jon Woods.**

**A. Hank Wilkins and Jon Woods.**

Mr. Goss admits improper payments or benefits were provided to former Arkansas State Representative Hank Wilkins and former Arkansas State Representative Jon Woods. Mr. Goss pleaded guilty to a bribery component of the second superseding indictment as it related to Wilkins and Woods. Specifically, Mr. Goss admitted that he caused a check payable to St. James United Methodist Church in the amount of $30,000.00 to be issued, where Wilkins served as a pastor, resulting in the award of discretionary Arkansas General Improvement (GIF) funds at Wilkin's recommendation.[2] Mr. Goss also facilitated the employment of Woods' then fiancé at a program in Arkansas, resulting in the award of discretionary Arkansas GIF funds to the Non-profit at Woods' recommendation.[3] Woods' fiancé was hired by the Non-profit, and, by all accounts, was a good employee who worked there for several months before leaving for another job. Notwithstanding, the hiring of Woods' fiancé represented an improper financial benefit to Woods.

---

[2] The GIF funds awarded to the Non-profit were applied to the programs designated by the GIF grant and spent properly for programs administered by Dayspring Behavioral Health Services in Arkansas. (Exhibit TG-23).

[3] The GIF funds awarded to the Non-profit were applied to the programs designated by the GIF grant and spent properly for job training services in Arkansas for affected constituents. The Non-profit added an additional 25% of its operating capital to administer the program beyond the funds provided by the grant. (Exhibit TG-24).

The government's sentencing memorandum assigns an additional loss attributable to $90,000.00 in bribes in exchange for the hiring of Woods' fiancé in a job with the Non-profit. While it is true that Woods' fiancé was hired at the recommendation of Mr. Goss (and others), her salary was actually $70,000 annually. (Gov. Sent. Memo p. 33; Gov. Exhibit 1210). Also, Woods' fiancé only worked for the Non-profit four months before she resigned to accept employment elsewhere. (Gov. Exhibit 1210). Although the Non-profit received value from the services provided by Woods' fiancé (who was described as a good employee in Gov. Exhibit 1210), because she only worked four months, the value associated with this bribe should represent the actual she worked for the Non-profit (thereby receiving the benefit from having been hired), which was a total of four months. Four months' salary equates to $23,333.33 and represents the net benefit provided to Woods. Mr. Goss acknowledges that he should be held accountable for bribes paid to Wilkins and Woods of at least $30,000 for the Wilkins payment, and respectfully submits that, at most, the value of the wages actually paid to Woods' fiancé should be the amount of loss attributable to Woods. This value would represent $23,333.33.

**B. More than one bribe.**

The government, in its sentencing memorandum states, "the **defendants** object to the PRS's uncontroversial counting of the defendants' bribes as a basis for applying U.S.S.G. § 2C1.1(b)(1)'s 2-level enhancement (multiple bribes)." (emphasis added). (Gov. Sent. Memo p. 17). This statement is incorrect, as Mr. Goss <u>did not object</u> to or dispute this enhancement in his objections to the PSR. (See PSR Addendum). Mr. Goss acknowledges, at a minimum, the benefits provided to Wilkins and Woods, as he admitted in his plea agreement, constitute at least two bribes under U.S.S.G. § 2C1.1(b)(1). This example of misstating Mr. Goss' objection to this enhancement is not unlike the government's consistent attitude toward treating Tom and Bontiea Goss and their

independent actions as interchangeable. While Mr. Goss is responsible and should be held accountable for his own improper actions, blame should be assigned according to fairness and equity. While he acknowledges that founded relevant conduct may be considered against him, it does not mean he knew every action undertaken by any co-conspirator, including Bontiea Goss.

### C. Mr. Goss did not bribe Jeremy Hutchinson.

The government's sentencing memorandum next focuses on former Arkansas State Senator Jeremy Hutchinson. Hutchinson was not referenced as having been paid bribes within the statement of facts supporting Mr. Goss' plea of guilty, and with good reason. Hutchinson was an Arkansas State Senator who was introduced to Bontiea Goss by Cranford. Hutchinson was a licensed and practicing attorney in Little Rock, Arkansas at the time. Bontiea Goss, on the recommendation of Cranford, hired Hutchinson to provide general legal services for the Non-profit's Arkansas divisions within the state of Arkansas. It was agreed by those parties that Hutchinson would initially be paid $7,500.00 per month as a retainer for legal services. (See Gov. Exhibit 14). Mr. Goss did not play any part in the hiring of Hutchinson and ultimately had virtually no interaction with him. Hutchinson's monthly retainer increased to $9,000.00 in April 2014, where it remained until he was eventually terminated.

As noted by the government's sentencing memo, Hutchinson was hired by Bontiea Goss in April 2013. There is evidence Hutchinson provided some legal advice and services during his tenure as retained counsel. Hutchinson provided direct advice to some of the Non-profit's Arkansas locations, represented the Non-profit during its merger with HRA in Arkansas, and represented the Non-profit in at least one lawsuit in Arkansas by a former employee. (Exhibit Browne Aff., TG-25). Hutchinson also reviewed the effect of the merger with PFH in 2015, among other actions. (Exhibit Browne Aff., TG-25). Hutchinson was a poor record keeper. Despite his claim that he

23

executed an engagement letter with the Non-profit upon his hiring, he was unable to produce a copy at the request of corporate counsel for the Non-profit. Hutchinson later generated a new letter, purporting to memorialize the scope of representation. While it is acknowledged that a portion of the monthly retainer paid to Hutchinson could eventually be considered a bribe, at the beginning of the relationship, Hutchinson provided some basic legal services. It is not disputed that Hutchinson was not a particularly effective lawyer.

Notwithstanding, Mr. Goss had little if anything to do with Hutchinson. In early 2015, Mr. Goss emailed his accounting team, asking who Hutchinson even was:

> On Thu, Jan 29, 2015 at 10:57 PM, Tom Goss <tgoss@aoinc.org> wrote:
>
> Who is Hutchinson and what did they do.
>
> Tom Goss
>
> > On Jan 29, 2015, at 4:44 PM, Abby Lathrom <alathrom@aoinc.org> wrote:
> > >
> > > Tom,
> > >
> > > Here are the circles I mentioned. There are 3.
> > >
> > > The first one with the highlighted total is for two check re-issues and a
> > > couple OJT checks for Feb rent. The total is *$1,064.78*
> > >
> > > The second one with the highlighted total is for 6 SOC area 9 checks. The
> > > total is *$130.00*
> > >
> > > The third (and last) one is for February rents and Hutchinson Law Firm. The
> > > total is *$95,640.03*

(Exhibit TG-26).

The government suggests that Bontiea and Mr. Goss caused Hutchinson to be paid monthly, constituting separate bribes for each payment in exchange for the performance of official action in favor of the Non-profit. Hutchinson was hired as an attorney for the Non-profit. As such, Mr. Goss

suggests no loss or bribery value should be apportioned to him in considering sentencing. Mr. Goss does not dispute that Hutchinson performed actions that were favorable to the Non-profit. Although Mr. Goss did not participate in the hiring or bribery of Hutchinson, should the Court consider assigning some value for Hutchinson's actions, he suggests that the totality of retainer payments amounting to $379,500 is not an appropriate measure of loss which should be assigned to him. The evidence indicates Mr. Goss had very little interaction with Hutchinson throughout the lifetime of the paid relationship with the Non-profit. Because there is evidence Hutchinson acted as the Non-profit's counsel in various capacities, any apportioned loss should be much less than the amount suggested by the government.

The government's sentencing memo focuses on the idea that Mr. Goss is responsible for the bribery of Hutchinson because he was "concealing" the Hutchinson relationship. In support of this argument, the government points to a single email in late 2015 wherein Mr. Goss stated, "There is no need for the letter since (Hutchinson) doesn't provide legal services." (Gov. Exhibit 1513). This conclusion misstates the context of the cited email exchange. In the original query posed to Mr. Goss, internal auditor Tom Weber asked for updated contact information through which the external auditor could send Hutchinson what is commonly known as an attorney "audit letter". As part of its review, external auditors are required to identify contingent liabilities when auditing an entity or organization. A contingent liability is a potential liability that may occur in the future, such as a pending lawsuit. It is standard for external auditors to send an audit letter to attorneys actively representing the entity in litigation to seek a written response identifying whether the litigation represents a contingent liability that should be reported on the company's financial audit.[4] In this instance, Mr. Goss' reply to Weber was indicative that he did not believe Hutchinson to be

---

[4] See Generally Accepted Accounting Principles (GAAP); and International Financial Reporting Standards (IFRS)

actively involved in litigation, hence his response. Because of this email, the government concludes Mr. Goss was actively concealing Hutchinson's role from external auditors. This argument is flawed, as the external auditors had full visibility to payments to Hutchinson within the financial records and knew of the existence of the relationship with Hutchinson. Mr. Goss suggesting an audit letter was not required did not conceal anything, as the issuance of an audit letter has nothing to do with identifying whether Hutchinson performed the duties for which he was ostensibly hired.

Further, Hutchinson himself was interviewed by the Non-profit's counsel on October 12, 2016, during which Hutchinson (JH) stated:

> **3. Tom Goss**
>
> JH said he never talked to Tom Goss on the phone, and never emailed him. (*counsel note*: see produced emails). He met Tom for the first time in Springfield when JH was giving the Board an update. He might have met Tom one other time.
>
> JH had limited interaction with Tom. Discussions he had with Tom were not about business. They were more about general talk, *i.e.*, nice to meet you; about baseball.
>
> JH said he might have had a conference call with Tom when Tom was upset about Grant Tennille.

(Exhibit TG-27).

### D. Hutchinson's legislative actions did not impact legislation in Arkansas.

The government focuses on legislative acts supported by Hutchinson as purported proof that he was carrying out acts favorable to the Non-profit in exchange for bribes. The first legislation referenced by the government related to an Arkansas Department of Human Services (ADHS) proposal intended to implement programs called Episodes of Care and Health Homes, which would have modified fee-for-service models of health care for individualized service, moving

toward a bundled payment for "episodes of care." (Exhibit TG-28, pp. 57-59). This plan not only affected behavioral health providers in general (like the Non-profit), but it also affected plan payment options by the State via Medicaid for general healthcare, including physical healthcare treatment for medical diagnoses including cardiovascular disease, diabetes, pregnancies, and other medical conditions. Virtually **all** the medical and behavioral service providers operating in Arkansas were opposed this proposed legislation, in part, because they opined that patients would not receive necessary medical, mental or behavioral health services, and due to the uncertainty about how the program might function under the proposed systemic changes.

The government states, "the defendants opposed these initiatives, and **ultimately, Hutchinson prevented Episodes of Care and Health Homes from being implemented** in the behavioral setting...." (Emphasis added). (Govt. Sent. Memo, p. 21). It is important to first understand that HB 1129 merely imposed a moratorium on implementation of Episodes of Care until the following year, and in the interim, required ADHS to report to legislative committees the anticipated effects of the proposed legislation.

Further, It is a tremendous overstatement to state that "Hutchinson **prevented**.......(legislation)....from being implemented," as an examination of the voting record in House Bill 1129 revealed that the bill passed 84-0 in the House of Representatives. (Gov. Exhibit 1558). Similarly, House Bill 1129 passed in the senate by a vote of 34-0. (Gov. Exhibit 1564). These bills passed both legislative bodies without a single vote against them. HB 1129 did not pass because Jeremy Hutchinson supported it-**quite literally no one in the legislature opposed it.**

But the analysis does not end there, as the government conducted multiple interviews with John Selig, then Director of AHDS, who was responsible for proposing the Episodes of Care/Health Home legislative reform in 2014. The government specifically asked him about Bill

1129 and its effect of causing a moratorium until the following year. Selig recalled the opposition to the bill being universal by health care providers, but had a specific recollection that Dan Sullivan, CEO of Ascent Health Care was opposed to the legislation. (Exhibit TG-29, pp. 104-107). (Sullivan was elected to the Arkansas House the following year and is currently a Senator). Selig stated that he was involved in the legislative discussions and was copied on the email modifying the bill with the proposed moratorium, (Gov. Exhibit 2137), which meant "no one was trying to hide it" from him. See also, (Exhibit TG-29, pp.115-118). Selig told the FBI and government attorneys that Bill 1129 "reads to me like it was something that (we) brokered…." (Exhibit TG-29, pp. 117-118.) In other words, **Selig was <u>in favor of</u> delaying the changes** proposed by the ADHS on Episode of Care/Health Homes until the following year, as it provided everyone additional time to discuss the effects of the proposed legislation. This was further evidenced by an email sent by Joy Figarsky, ADHS on February 25, 2014, in which they proactively announced a timeline commensurate with the changes proposed by Bill 1129 and included a copy of the Bill. (Exhibit TG-30). This email was sent approximately two weeks before the bill was voted on by Hutchinson and others.

The reality is Bill 1129 was simply memorializing a compromise between the legislature and Arkansas Department of Human Services. Hutchinson was not even mentioned by the FBI or Selig during this interview and was not responsible for "preventing" the passage of Episodes of Care/Health Homes. Although it is true Hutchinson voted in favor of the bill, his actions had no meaningful impact on the legislation.

### E. Hutchinson's legislative actions did not negatively impact Arkansas Criminal Justice Reform.

The government next alleges Hutchinson proposed a specific prison reform bill that would favor the Non-profit. As a threshold matter, there is no reference whatsoever to this legislation within the PSR, or any reference to Mr. Goss' alleged role in same. In fact, this allegation was raised for the first time in the government's sentencing memorandum. In the addendum to the PSR, filed June 9, 2023, the government represented that it "had no objections" to the PSR, as drafted.

Notwithstanding, in late 2014, Hutchinson contacted Cranford and suggested a new opportunity for vocational services could result from a prison reform bill under consideration. (Gov. Sent. Memo). Cranford asked Mr. Goss generally for his thoughts about prison reform, and Mr. Goss sent an email summarizing his suggested approach for vocational rehabilitation (along with other unrelated cost saving solutions) to reduce the number of prison inmates. (Gov. Exhibit 2309). An early draft of the bill did not reference behavioral health service providers. Behavioral health providers are the entities who provide vocational services for persons recently released from prison, which was one of the primary purposes of the bill. It was suggested that the bill be modified to add a provision for providers specializing in "behavioral health, case management and job services." (Gov. Exhibit 1537). The government, in its sentencing memorandum, accuses Bontiea Goss (and presumably Mr. Goss) of attempting to "put the Non-profit in the bill". (Gov. Sent. Memo, p. 25). To the contrary, this language added <u>ALL</u> behavioral health, case management and job service providers as eligible to provide the services described in the bill. (Gov. Exhibit 1537). This bill aided the entire behavioral health industry in Arkansas, as well as providing a means to seek to reduce prison populations and combat recidivism.

29

SB 472 was co-sponsored by nineteen (19) separate senators and twenty-three (23) separate representatives. SB472 passed the Arkansas House by a vote of 79-5 on March 24, 2015.[5] SB472 passed the Senate by a vote of 33-0 on March 26, 2015.[6] The bill was signed into law by the Governor of Arkansas and enacted on April 1, 2015. It is true that Hutchinson voted in favor of this bill, and that the bill *could* have eventually been favorable to the Non-profit. It is also true this language benefitted all behavioral healthcare providers in Arkansas (in addition to the idea that prison reform which included these services could lower costs of housing prison inmates, if rehabilitated). Hutchinson's vote was only one of thirty (33) votes in favor of the unopposed bill. Hutchinson was hardly responsible for passing the bill. This bill was beneficial to the entire behavioral care industry, not to mention the State of Arkansas. While it is true Hutchinson voted in favor of the bill, his actions had no meaningful impact on the legislation. Additionally, the Non-profit expended substantially more funds than those involved in the bribes for permissible lobbying efforts related to effecting legislation including the above legislative issues.

Finally, in support of its arguments that Mr. Goss instructed Hutchinson to block or oppose the legislation described above, the government cites no less than twenty-two (22) different exhibits for the proposition that Mr. Goss was involved in "directing" Hutchinson's actions. In reviewing the individual exhibits cited within the government's sentencing memo, Mr. Goss was not even involved in eighteen (18) of the cited exhibits. (Gov. Exhibits 2120, 2122, 2165, 2129, 2157, 2135, 1510, 2137, 2139, 1558, 1564, 2149, 1532, 14, 2303, 2313, 2314, 1537, 2321). Mr. Goss was carbon copied on one (1) exhibit. (Gov. Exhibit 2149). The remaining three (3) exhibits in which Mr. Goss was a participant related to Cranford asking Mr. Goss for his opinions on prison

---

[5] https://www.arkleg.state.ar.us/Bills/Votes?id=SB472&rcs=1486&chamber=House&ddBienniumSession=2015%2F2015R
[6] https://www.arkleg.state.ar.us/Bills/Votes?id=SB472&rcs=1315&chamber=Senate&ddBienniumSession=2015%2F2015R

reform in Arkansas, and a request to educate Hutchinson on the benefit of vocational rehabilitation in a prison reform setting, including the cost savings effect of transitioning prisoners to a vocational rehabilitation setting, to help find jobs. (Gov. Exhibits 2309, 2315, 2313). To put this into perspective, there were 4.4 million documents produced by the government as discovery in this case, and the government has effectively cited four emails (two of which were merely proposing a phone call) in support of their argument that Mr. Goss was bribing Hutchinson as it relates to this issue. An analysis of the emails cited by the government reveal that almost all the email in which Mr. Goss was a party was oriented at explaining the benefits and cost savings of prison reform generally. Id. Many of the cost savings suggestions provided by Mr. Goss aren't even related to the services the Non-profit provided. Id. At the end of the email sent to Cranford, Mr. Goss infers that the Non-profit would be suited to provide these services if the state chose to pursue vocational services in a prison reform setting, but this is a far cry from instructing Hutchinson to draft and pass legislation specific to the Non-profit itself. Published IRS guidance on educating legislators states, "organizations may conduct educational meetings, prepare and distribute educational materials, or otherwise consider public policy issues in an educational manner without jeopardizing their tax-exempt status."[7] At Cranford's request, Mr. Goss agreed to schedule a call with Hutchinson to discuss prison reform in general. The truth about the correspondence cited by the government is that Cranford, not Mr. Goss, was the one who told Hutchinson what to do. In summary, the sole evidence linking Mr. Goss to the bribery of Hutchinson for the legislative acts is: 1) The existence of the retainer payments to Hutchinson; 2) Three emails suggesting a phone call and discussing the benefits of prison reform; and 3) The suggestion that Mr. Goss "actively concealed" Hutchinson's true role by dissuading the issuance of an audit letter.

_____

[7] See https://www.irs.gov/charities-non-profits/lobbying.

## The Bribes To Lawmakers Did Not Result In More Than $11 Million In Revenue And $3 Million In Profit.

The government, in its sentencing memorandum has introduced, for the first time, a monetary value of more than $11 million dollars it suggests was realized by the Non-profit as a direct and consequential result of the bribes paid to Hutchinson, Wilkins and Woods. The majority of these figures were not previously referenced in the plea agreement or discovery, nor were they included in the PSR or addendum as a potential loss, restitution or forfeiture amount. Quite literally, the first time many of these numbers have been introduced to this proceeding is in the government's sentencing memorandum. Setting aside the procedural impropriety and due process concerns related to the government addition of a multimillion-dollar loss amount on the eve of sentencing, these numbers are patently false and speculative.

Mr. Goss agrees that monies totaling $1,122,564.93 in GIF funds were awarded by Woods ($1,000,000.00) and Wilkins ($122,564.93) to the Non-profit. When the GIF monies were awarded to the Non-profit by the State of Arkansas, the accompanying grants contained specific restrictions on how the funds could be used or spent. The $1 million dollar grant was earmarked for a jobs training program administered by Dayspring of Arkansas, an organization owned by the Non-profit. These funds were spent, as required, on the program, which provided jobs training services for over seven hundred constituents during a three year period. Further, the Non-profit spent an additional 25% above the $1,000,000.00 of its surplus funds on staffing to ensure the program's success. (Exhibit TG-24).

The smaller GIF grant ($122,564.93) was also spent according to the grant restrictions for services to constituents at Dayspring. Similar to the previous grant, the Non-profit added

approximately $150,000 of its surplus funds to match the Arkansas grant for the administration of the program goals. (Exhibit TG-23).

Although these funds are described as having been received as the result of bribes in the instant offense, the total GIF funds ($1,122,564.93) should not be included in any calculation as a loss amount or funds received pursuant to a bribe under the definition of loss under Sentencing Guidelines. See U.S.S.G. §2C1.1(b)(2). The commentary to 2C1.1 defines loss as the value of the bribe plus the <u>net</u> value of the benefit. In other words, aside from the monetary value of the bribe itself, the GIF funds would represent the net value of the benefit. Here, the net value is $-0-, as not only were the funds were spent as required within the program parameters-thereby providing the services for which the state bargained-but additional funds were expended by the Non-profit to ensure program success.

The government next suggests that the Court should calculate the projected loss related to the previously discussed legislative acts related to Hutchinson, specifically, the moratorium on legislative changes to Episodes of Care and a moratorium on the issuance of RSPMI numbers. To add to the confusion created by including new issues for the first time in a sentencing memorandum, RSPMI numbers were not previously mentioned or discussed in the PSR or elsewhere in the government's sentencing memo. Further, neither of the legislative acts referenced by the government in its sentencing memorandum directly relate to RSPMI.

Notwithstanding, the government suggests that "Episodes of Care and RSMPI reform increased the Non-profit's one-year revenue by $10,062.955.76." (Gov. Sent. Memo p. 38). This allegedly resulted in "net profit to the Non-profit of $1,824,598.47 and $1,867,552.17." (Gov. Sent. Memo p. 38) This statement first ignores the fact that the Non-profit is an organization chartered under 501(c)(3) as a "non-profit organization," therefore, there has been <u>zero profit</u> earned at any

time. Perhaps more shocking is the purported source of these numbers. The governments' calculation are entirely derived from a single document generated by Tom Weber (cited as Gov. Exhibit 803), in which he attempted to estimate the financial impact of the services provided by Cranford Coalition as a lobbyist in 2015. The government appears to rely on this document as its sole basis for calculating estimated programmatic revenue, and corresponding "profits" realized by the Non-profit.[8]

Interestingly, the government conducted a transcribed interview with Weber on July 12, 2017, in which the chart included as Gov. Exhibit 803 was the subject of discussion with government lawyers and the FBI. (Exhibit TG-31). During the interview, Weber, who admitted he had been on the job three weeks when he created Gov. Exhibit 803, stated that he "would have had no idea what that (RSPMI) was three weeks on the job when I'm preparing this document." (Exhibit TG-31, p. 33). Weber further stated, "I would have no way of knowing if what they told me (as the basis for these calculations) that, you know, if episodes of care is even a real thing." (Exhibit TG-31, p. 34). The following exchange took place with Mr. Elser, the government attorney and Weber:

---

[8] It is not improper or illegal for a Non-profit to generate cash reserves for operational expenses. Because most government or private health care programs pay sometimes as long as ninety (90) days or later, the Non-profit must have adequate cash reserves on hand to meet payroll and other routine operational expenses.

```
13        MR. ELSER:  So basically -- let me ask you
14   this:  Even though it says this was -- this was just a
15   summary you prepared from information other people
16   provided, then you don't know whether it's true or not;
17   is that fair to say?
18        MR. WEBER:  Yes, I think that's fair to say.  I
19   don't know if the estimates they gave me are necessarily
20   true or not, which was why I put the disclosure
21   statement on the front of it for the board.
```

 (Exhibit TG-31, p.33).

This dialogue continued for some time and represented the government's extensive efforts to discredit Weber's calculations in 2017. Weber repeated his doubts regarding the validity of the numbers presented in Gov. Exhibit 803 during a subsequent interview dated March 20, 2018. (Exhibit TG-32).

It is concerning that the government would now rely on the same document it sought to discredit in 2017 and 2018 as the sole evidence in support of an enhancement and/or restitution request of an **additional $3,692,150.64** against Mr. Goss. This amount should absolutely be ignored by the Court as its credibility is virtually non-existent, as noted in the excerpts of government interviews. It is also worth noting that the government did not include any of these calculations in the sentencing proceedings of Hutchinson, Cranford, or presumably, Nolan, each of whom pleaded guilty for acts directly related to bribes.

Finally, in the event the Court believes it were appropriate to consider the amount proposed by the government, the estimate of $3,692,150.64 should not be included as a loss amount, as there

is zero proof these fees were actually earned by the Non-profit. Even if these amounts had been earned, they would not constitute a bribe under the Sentencing Guidelines. As previously noted, the commentary to U.S.S.G. §2C1.1 defines loss as the value of the bribe plus the <u>net</u> value of the benefit. In other words, aside from the monetary value of the bribe itself, any funds derived by the Non-profit from a bribe, but used by the Non-profit for the implementation of programs or any surplus related to same, are <u>not</u> included in the loss calculation. Even had the Non-profit received these funds, there is no suggestion that any of these estimated funds were not used by the Non-profit for its intended purpose, therefore, it cannot be included as loss.

### <u>Mr. Goss Should Not Receive A 4-level Adjustment For Leader/ Organizer.</u>

The government is seeking a 4-level upward adjustment by labeling Mr. Goss as "Organizer or Leader." The government seems to conflate Mr. Goss' leadership within the Non-profit with what they characterize as leadership of a conspiracy. The clear leader of the expansive conspiracy charged by the government, is Rusty Cranford. But for Cranford, Mr. Goss would have never known of Arkansas legislators Hutchinson, Wilkins, and Wood.[9] These public officials, as well as others who Mr. Goss never met, but were described as participants in the government's conspiracy, were all connected via Rusty Cranford. The outer ring, if you will, of the government's charged conspiracy is made up of Mr. Goss, and the other employees of the Non-profit. They did provide money, at Cranford's insistence, to state officials. They did consult and advise, and seek legislative changes, which is all permissible lobbying activity, but the power and control to actually make legislative changes was held by the respective **public officials**.

---

[9] Mr. Goss interacted with Hutchinson on a very limited basis and met Woods only once. Mr. Goss never met Wilkins.

In looking at the entire conspiracy and the way the government presented it within the Second Superseding Indictment, a realistic view would be to view Cranford as the leader/organizer or "center" of the conspiracy, warranting a four-level enhancement.[10] Cranford was also accused by the government of attempting to hire a hit man to murder one of the witnesses against him in this investigation, though he eventually received a government recommended sentence below even that of what the government seeks for Mr. Goss, despite Cranford having pleaded guilty to a crime with a higher sentencing range than that of Mr. Goss. (See Gov. Exhibit 16 & Exhibit TG-33). Next would be the public officials, those who are held to a higher standard because of their position - those who actually controlled not only the ability to change/create legislation, but also controlled state government funds and to whom those funds were directed, betraying the trust of their electors in the process. It would seem appropriate to award a three-level adjustment to those in this second "ring". It is also notable that Cranford, Hutchinson and Wilkins each pleaded guilty and/or admitted to bribery or having received bribes from other persons completely unrelated to Mr. Goss or the Non-profit. Finally, the outer ring, is comprised of Mr. Goss and others at the Non-profit who provided money to state officials and suggested legislative changes subjecting them to a two-level or three-level adjustment. If the government's analysis is correct – they will have argued for almost every single person in the conspiracy to be the leader/organizer, which seems disingenuous at best. To further this point, Mr. Goss engaged forensic accountants and a retired IRS Supervisory Special Agent to conduct reviews of financial documents, tax returns, and government interview transcripts and summaries for several years in preparation for this hearing. And although Mr. Goss, through the Non-profit, has performed similar work in numerous states since the early 1990s,

---

[10] Mr. Cranford, that Actual leader of this entire conspiracy, was also arrested for attempted murder, only served less than three years in prison following sentencing.

including-Colorado, Illinois, Oklahoma, Georgia, Kansas, and Iowa-aside from the current conspiracy stemming from Cranford and the Arkansas legislators, there is zero evidence of any type of bribery relating to those states. Rusty Cranford was inherited by the Non-profit as an employee during the acquisition of Dayspring of Arkansas. The bribery occurred only in Arkansas and centered around Cranford. Mr. Goss acknowledges his responsibility for the criminal activity for which he entered a guilty plea, including receipt of the kickbacks from Cranford, but a realistic view of the facts all point to Rusty Cranford and the legislators from Arkansas as the responsible leaders and organizers of this conspiracy.

**Mr. Goss Should Be Held Responsible For Kickbacks Received Totaling $356,350.**

Mr. Goss pleaded guilty to receiving kickbacks from the Cranford Coalition. Mr. Goss admits receiving $356,350 from the Cranford Coalition, which he deposited in bank accounts under his control. This loss amount is the actual monies received by Mr. Goss and should be utilized in considering a sentence.

By way of explanation, it is important to note that the draft presentence report, issued February 8, 2023, did not break down the loss amount in specific detail, but was instead estimated to be a total loss of $4,350,000, based on an inability to calculate an actual loss. Following an objection to this paragraph by Mr. Goss, which included a request to provide a precise breakdown of the estimated loss, the revised PSR added the loss amount of $356,350 to be applied to Mr. Goss' guideline calculations as the loss caused by the kickback scheme. (The total loss was increased to $5,269,843.83). Mr. Goss agrees that he improperly received $356,350, as contained within the revised presentence report.

In its sentencing memorandum, the government has since assigned a value of "$735,875" as the proposed loss related to the kickbacks. The Cranford Coalition received payments from the Non-profit for consulting services in an amount of $735,875 during the relevant time period. However, Cranford only provided $356,350 to Mr. Goss-which is the amount for which he should be held responsible. The remaining funds were paid to Cranford Coalition as part of his contractual relationship with the Non-profit. The evidence does not support inclusion of the additional $379,525 received by Cranford as a loss attributable to Mr. Goss.

Finally, although Mr. Goss also pleaded guilty to failing to timely report income related to the receipt of the $356,350, for which he is guilty, the Court should be aware that Mr. Goss did voluntarily amend his tax return the following year and report the additional $356,350 as income to the Internal Revenue Service, for which he paid income tax, including penalties and interest at an effective tax rate of 34.78% for the 2013 tax year. This represents an approximate amount of $123,938.53 paid as income tax on the improperly received funds. (See Gov. Exhibits 2444, 2445 & 2446). Because this amount was previously paid to the government in the form of income tax, Mr. Goss' total final monetary judgment should be reduced by the corresponding amount of taxes paid, which is $123,938.53.

**Mr. Goss Did Not Steal Money Through An Alleged Scheme To Artificially Inflate Vehicle Leases.**

In its sentencing memorandum, the government alleges that Mr. Goss (and others) illegally profited from the chargeback of an inflated car leasing agreement administered through a for-profit entity, White Dog Asset Holdings (WDAH), resulting from overcharging the Non-profit for use of the vehicles by an excess of $1,132,424.55. This allegation is absolutely unfounded. The surplus funds charged above the actual lease costs were offset by undercharged costs for real property and rents, resulting in a net loss to Tom and Bontiea Goss throughout the lifetime of the relationship.

39

By way of background, in 2006, the Non-profit was in its relative infancy and was unable to secure credit from lenders for commercial loans with which to purchase real property and assets, including a contract with Enterprise Car Leasing (Enterprise). Because of the vast geographical diversity of its locations, Non-profit employees were initially required to drive from location to location in personal vehicles to provide services to constituents, for which the employees were reimbursed for the incurred mileage expense. Because this expense was so costly, a need presented itself for company to furnish vehicles to be made available for use by the employees. As the Non-profit was unable to secure the credit necessary to facilitate an agreement with Enterprise, the Resource Team, including Mr. Goss, pledged their personal credit to secure the leasing agreement. Because this relationship with Enterprise required a contract in addition to the credit assurances, the contract was signed between WDAH and Enterprise, by the owners of WDAH, which included Tom and Bontiea Goss. As a result, vehicles were made available for daily use by the Non-profit's employees. WDAH in turn charged the Non-profit a cost for the leases, typically paid in equal monthly increments. The arrangement was known to the Board of Directors, outside counsel representing the Non-profit (Polsinelli), and internal and external auditors. The existence of these relationships was further disclosed annually on the Non-profit's form 990 tax returns.

The government, in its sentencing memo, selectively presented an analysis including five years during this business relationship – 2010 through 2015 and included a table in which it depicts the chargeback to the Non-profit at a higher amount than the actual cost of the lease by an average of several hundred thousand dollars annually. The government concluded the difference in these values represents evidence that Mr. Goss embezzled or stole these funds for personal use. The government also reviewed Tom and Bontiea Goss' personal bank records and has not suggested that any of these funds were illegally disseminated to them personally. The government's analysis

40

of the car leasing charges is incomplete, unsupported and grossly misrepresents the nature of the business relationship, which, if viewed as a whole, does not support the accusation that Mr. Goss embezzled or stole the funds in question.

A second for-profit entity, White Dog Properties (WDP), created under similar circumstances as WDAH and reported on the Non-profit's form 990 as a related party, which owned and managed certain real estate and real property leased back to the Non-profit, primarily for use as its headquarters and other operations facilities utilized by the Non-profit. WDP also leased space in the office building to other entities and allowed some other nonprofit entities to utilize space rent free. The Nonprofit was not in the rental business, so it was appropriate for WDP to own and operate the rental property. WDAH also held other real property, in addition to the car leases and other expenses. The reasons behind this arrangement with WDP were the same as with WDAH-the Non-profit was unable to secure long term financing through which to purchase the real property, thus, Tom and Bontiea Goss, and several others, once again pledged their personal credit to purchase the real estate, at their own personal financial risk, which was then leased to the Non-profit.

Both WDAH and WDP paid the debt and were responsible for the ownership of real properties necessary to provide the Non-profit a physical location for its employees and operations. In turn, WDAH and WDP charged rents for the use of these properties and undertook responsibility for the maintenance and upkeep of the properties, while servicing the substantial debt.

This relationship was explained in 2010 via a summary created by David Hayes, then Board Member and internal accountant, who detailed the relationship between the Non-profit and WDAH/WDP. In some detail, Hayes explained the nature of the vehicle lease, the basis for the costs, the personal credit risk undertaken by the for-profit owners (including Tom and Bontiea

41

Goss) and opined that the relationships represented the receipt of fair market value paid by the Non-profit. This memo was provided to the Non-profit's attorney, Polsinelli, along with external auditor Seim Johnson in 2010. (Exhibit TG-35)

This related party relationship was again examined by Hayes in 2013, wherein he evaluated the financial leasing relationship between the Non-profit and WDAH/WDP, and opined that the Non-profit was paying fair market value for the services it received. (Exhibit TG-36). In this memo, Hayes explained that the Non-profit was paying an additional monthly fee of **$47,500 above the cost of the Enterprise Lease**, but which was used to offset unpaid costs related to the real property expenses which had not otherwise been passed through to the Non-profit. This memo included a fair market value analysis of the relationship. The government, in its sentencing memorandum, alleges that Hayes' memorandum is insufficient to document these charges and ***"was only shared with the defendants and their co-conspirators, Nolan and Noble."*** This is false. This memo was presented by Hayes to the Board of Directors during its May 8, 2014, meeting, as referenced by the corresponding minute, followed by a question/answer session as to the content of the memo and discussion surrounding the related party relationships. (Exhibit TG-36).

Yet another fairness analysis on this subject was conducted by Tom Weber in a memo dated February 9, 2015, presented to, and approved by the Board of Directors on February 19, 2015. (Exhibit TG-37). The government suggests this memorandum "never determined that the arrangement was at "market value rents" and were "fair and appropriate" and merely relied on Hayes' prior opinions. However, in an email to Non-profit counsel, Weber stated that he was "updating an analysis David Hayes used…." And recommended independent review by a commercial broker. (Exhibit TG-38). The fairness analysis, as approved by the Board of Directors, speaks for itself and supports the opinion that the Non-profit paid below fair market value for the

42

value of the benefits provided by WDAH/WDP. (Exhibit TG-37). The Non-profit had similar leasing agreements on numerous properties throughout several states. Several of these unrelated leases charges a rate per square foot much higher than that of WDAH/WDP. (Exhibits TG-31, TG-183).

WDAH and WDP were sister companies with the same ownership, which included Tom and Bontiea Goss, Marilyn Nolan and Keith Noble, among others. WDAH charged back leasing costs related to the Enterprise agreement to the Non-profit, and both WDAH/WDP charged back rents for use of the numerous real properties. From 2006 through 2008, and in 2010-11, WDAH incurred substantial net losses from the relationship with the Non-profit. In 2010, ownership of the for-profit entities realized they were undercharging the Enterprise lease payments back to the Non-profit, resulting in annual losses, and increased the car leasing fee, which resulted in a net gain on WDAH's balance sheet in the last few years of the relationship. Effectively, the car leases were *overcharged* by WDAH from 2010-2015, but *undercharged* for the real properties leased from WDAH from 2010-14, resulting in a net loss to WDAH in most years. An examination of income reported in its filed tax returns filed in each relevant year by WDAH reveals the following net income or loss, as depicted in the chart below:

43

## White Dog Asset Holdings, LLC

| Year | Vehicle Lease Schedule Form 8825 Income or Loss | Real Estate Rental Schedule Form 8825 Income or Loss | Total | |
|------|-----|-----|-----|---|
| 2015 | $216,172 | $28,293 | $244,465 | |
| 2014 | $271,523 | ($76,368) | $195,155 | |
| 2013 | $231,800 | ($117,740) | $114,060 | |
| 2012 | $212,955 | ($128,002) | $84,953 | |
| 2011 | $183,850 | ($211,206) | ($27,356) | |
| 2010 | $11,095 | ($347,144) | ($336,049) | |
| 2009 | | | $20,340 | * |
| 2008 | ($89,672) | ($16,067) | ($105,739) | |
| 2007 | ($117,847) | ($102,371) | ($220,218) | |
| 2006 | ($622,045) | ($172,095) | ($794,140) | |
| 2005 | | ($73,704) | ($73,704) | ** |
| | $297,831 | ($1,216,404) | ($898,233) | |

\* Combined into one schedule.

\*\* No leased vehicles activity.

(Exhibit TG – 157, Kimbrough Aff.).

Further, an analysis of the lifetime capital contributions, distributions and equity of each of entities in which Tom and Bontiea Goss possessed an ownership interest through December 31, 2015, revealed the following:

| Entity | Capital Contributed by the Gosses | Total Distributions to the Gosses | Gosses Remaining Equity | Net Return on Investment |
|--------|-----------------------------------|-----------------------------------|--------------------------|--------------------------|
| WD Properties | $51,897 | $388,020 | $0 | $336,123 |
| NWARPMG | $0 | $1,924 | $0 | $1,924 |
| WDAH | $1,255,526 | $494,460 | $18,024 | -$743,042 |
| Total | $1,307,423 | $884,404 | $18,024 | -$404,995 |

(Exhibit TG – 157, Kimbrough Aff.).

Further analysis revealed the Goss' share of net profit or loss related to their investment in the entities:

| Entity | Goss's Share of Net Profit or Loss | | |
|--------|------------------------------------|--|--|
| | Tom Goss | Bontiea Goss | Combined Total |
| NWARPMG, LLC | -$970 | -$970 | -$1,940 |
| WDAH, LLC | -$279,378 | -$279,378 | -$558,756 |
| WDP, LLC | | | $359,498 |
| Total | | | -$201,198 |
| | | | |

(Exhibit TG – 157, Kimbrough Aff.).

Tom and Bontiea Goss, after personally contributing nearly $1.3 million dollars into WDAH/WDP, experienced a **net loss** of over $200,000.00 on their personal investment in these entities. An examination of the full and complete financial records related to these entities reveals that no

money was illegally taken or removed by the Gosses from the Non-profit through this arrangement. (See Exhibits TG-157 and TG-25). The government's analysis was simply incomplete.

Further, the Non-profit's external Counsel (Polsinelli Law Firm) and auditors (Seim Johnson) were aware of the nature of the related party relationship between the Non-profit and the for-profit entities described herein from their earliest days and were discussed by counsel and auditors during the defense of a 2012 IRS civil audit, which eventually resulted in no negative findings against the Non-profit by the IRS. (Exhibit TG-69).

Hypothetically, even if Tom and Bontiea Goss had received some long term financial benefit from owning WDAH and WDP in its relationship with the Non-profit, there would have been nothing illegal about it. This is evidenced by communications between Polsinelli-the Non-profit's attorneys, and Seim Johnson-the Non-profit's external auditor, who each asked, during the IRS audit process, how much profit Mr. Goss made from WDAH. The answer was, "nothing material," to which the external auditor responded, *"If White Dog doesn't "profit", then why have the arrangement?.....I don't understand the purpose."* (Exhibit TG-39). The auditor was effectively saying that if one operates a related party for-profit business, it is acceptable to try to earn a profit that would be considered reasonable for any other arm's length business. As previously explained, the purpose of this arrangement was to secure financing for, and purchase of assets and service contracts for infrastructure for the primary benefit and use by the Non-profit through the pledging of security by Mr. Goss and other individuals at their own personal risk. Certainly, the Non-profit's outside counsel and external auditors would have raised an alarm had they any concerns about this relationship. Had the IRS concluded, during its 2012 audit, that an improper private inurement or benefit was received by Mr. Goss, the remedy would have been revocation of the Non-profit's

501(c)(3) not for profit status. Regardless, the IRS closed the audit without such a finding after receiving the responses provided by the Non-profit's counsel.

The relationship with the for-profit entities benefitted the Non-profit, as it would not have been able to secure credit for the terms of these loans had Tom or Bontiea Goss not agreed to personally sign as guarantors. Tom and Bontiea Goss were exposed to significant financial risk through this arrangement had the loans been called, and receipt of a modest revenue stream from this relationship was not excessive or improper.

Finally, common sense would dictate that large sums of cash being stolen by Tom and Bontiea Goss via such a scheme would have created a cache of records leading to the discovery of improper monetary deposits in their personal bank accounts. After examination of the Goss' personal bank records, the government identified no such improper cash stream-because it simply does not exist..

**Mr. Goss Did Not Steal From The Non-profit By Causing The Improper Leasing And Sale Of Vacation Properties.**

In 2007, WDAH (owned by Tom and Bontiea Goss, Marilyn Nolan and Keith Noble) purchased a 500 acre parcel of property with a home near Ponca, Arkansas, referred to as the "Mountain House". In 2009, a house in Eureka Springs, Arkansas was purchased by WDAH, referred to as the "lake house". These two houses were, in turn, later leased to the Non-profit for use as corporate retreats, training, and use by certain employees.

The government, in its sentencing memorandum, suggests the charging of rent to the Non-profit constitutes theft or embezzlement, and suggests the homes were simply purchased for the

pleasure of Tom and Bontiea Goss in anticipation of retirement, as well as for the benefit of the other owners.

The properties were used from time to time by the Non-profit for retreats, meetings and was opened to leadership for use by request. While the government, in its sentencing memorandum, citing the tracking of use of the properties during 2014 and 2015, suggests the property was sparingly used by the Non-profit, these statistics are misleading, as there was no tracking of the usage of the properties prior to 2014. Additionally, lease payments ceased and the properties were purchased by the Non-profit at the beginning of 2015. Numerous employees, board members, and executives of the Non-profit informed the government during their interviews that they attended meetings or retreats at the properties throughout the years the relationship existed. There were often Regional Director meetings at the "lake house". There is little evidence to suggest Tom or Bontiea Goss used the properties more than a few times per year.

Contrary to the government's suggestion, there was never an effort to conceal the payments that were made by the Non-profit for the rental of these properties. The existence of these properties has long been known by external auditors, the board of directors, and the Non-profit's outside counsel. In 2012, during the IRS civil audit, attorney Tom Schenkelberg of Polsinelli was engaged to represent the Non-profit. Seim Johnson, who performed the external audits annually were also involved in defending the Non-profit against the proposed audit findings. In preparation for the audit process, attorneys from Polsinelli, Seim Johnson and employees of the Non-profit met on numerous occasions to discuss the underlying facts and strategy for dealing with the IRS. On June 8, 2012, Barb Fajen, an auditor from Seim Johnson, took handwritten notes during a conference call with Schenkelberg (Polsinelli) and David Hayes, noting that "White Dog Asset

48

Holdings holds AK (sic) properties used by AO for retreats "Mt House" and "Dog House". EE (executive) use on weekends and told David to include in EE compensation." (Exhibit TG-40).



(Exhibit TG-40).

Similarly, on August 15, 2012, during a call with attorneys Schenkleberg and Bruce Hopkins (Polsinelli), along with auditors Brian Green and Joe Harnisch (Seim Johnson) and members of the Non-profit's executive team, took notes referencing buildings described as "vacation property in Arkansas used for retreats". (Exhibit TG-41).

When interviewed by IRS Special Agents on August 24, 2022, Fajen (Seim Johnson) stated that if the lake house and mountain house were used personally by employees, the use of the homes would need to be included in each employee's compensation. (Exhibit TG-42). In 2017, the Non-profit issued amended W-2's to both Tom and Bontiea Goss including their use of the lake house as income in tax years 2014-2016. Tom and Bontiea Goss promptly amended their returns for the affected years, reporting the added income from the use of the house and paying the assessed income tax. (See Gov. Exhibits 2444, 2445 & 2446).

Federal agents separately interviewed Schenkelberg, who stated that he was aware of the homes, and spoke to David Hayes about "cleaning them up" following the audit. (Exhibit TG-158). In making this statement, Schenkelberg was attempting to ensure the use and relationship with the property owners was appropriately documented as related party transactions.

49

Schenkelberg later worked with Weber to inform the board of the specific related party relationships with the houses and for-profit entities, and to let the board decide whether it wanted to keep or eliminate the relationship. Schenkelberg told agents these transactions are "not prohibited," but scrutinized by the IRS from an audit perspective. Schenkelberg stressed that such transactions had to be measured by fair market value. Id.

To that end, several analyses were conducted as to the fair market value of the rental payments by different internal accountants of the Non-profit. On November 21, 2013, David Hayes conducted an analysis of leases with related parties and presented an opinion that the rental payments were at or below fair market value. This memo was presented by Hayes to the Board of Directors during its May 8, 2014, meeting. (Exhibit TG-36). Similarly, Tom Weber, Internal Auditor, conducted a related party analysis on February 19, 2015, in which he described the purpose and use of the homes. This memo was presented to, and the related party relationships approved by the Board of Directors on February 19, 2015. (Exhibit TG-37).

In 2015, the legacy Non-profit, AO signed a letter of intent to merge with PFH. Polsinelli was asked to provide guidance to AO through the legal aspects of the merger. AO was advised by counsel that it should undo any and all related party transactions prior to the merger. The Resource Team, including Tom and Bontiea Goss and all of the owners of WDAH agreed to transfer all the property owned by the entities to the Non-profit at a value assigned by Weber. Weber, utilizing third party appraisals of the property, proposed a price for the sale of each property, which was below its fair market value. This price was accepted without negotiation by the owners of the for-profit entities, including Tom and Bontiea Goss. (Exhibit TG-38). This information was presented to the Board of Directors on March 21, 2015, during which they unanimously voted to move forward with the purchase of the properties. (See Gov. Exhibit 3096). Despite selling the properties

50

to the Non-profit, Tom and Bontiea Goss were required to stay on the loans obtained by the Non-profit for the properties as personal guarantors, making them personally liable for the loan upon default. (Exhibits TG-45 & TG-46). Weber presented the purchase prices to the AO Board of Director's Finance Committee on April 7, 2015, who unanimously voted to move forward with the purchase transactions. (Exhibit TG-47). Weber confirmed that he discussed the purchase of these properties with Polsinelli prior to presenting the recommendation to the Board during a government interview occurring on March 20, 2018.

Sale prices from WDAH to the Non-profit are reflected below:

| Sale of Property at below cost and market value | | | | | | |
|---|---|---|---|---|---|---|
| | Property | Sale Price | Appraised Value | Cost | Appraised Value vs Sales Price | Cost vs Sales Price |
| WDAH | Ponca, AR – Mountain House, Cabin and Land | $1,037,500 | $1,560,000 | $1,358,297 | ($522,500) | ($320,797) |
| WDAH | Eureka Springs – Lake House | $737,608 | $925,000 | $1,022,661 | ($187,392) | ($285,053) |
| WDAH | Lowell Point | $125,000 | $150,000 | $172,259 | ($25,000) | ($47,259) |
| Total | | $1,900,108 | $2,635,000 | $2,553,217 | ($734,892) | ($653,109) |

(Exhibit -TG-157).

As noted above, the owners of WDAH sold the properties to the Non-profit for $734,000 **below** market value.

The government alleges that the owners of WDAH refinanced one of the properties prior to the sale, taking out approximately $300,000 in equity in the process. The Non-profit agreed to purchase the real property for a specified price. Whether the owners had equity in the property was

of no consequence, as they still sold it for an amount below market value, as approved by the board.

The government suggests that the Non-profit was somehow "forced" into purchasing the homes. This is simply not true. The Board, advised by its own separate counsel, made the decision to purchase the properties following a detailed discussion led by Weber. The appraised value of the Mountain House was $500,000 above the sale price from WDAH. Likewise, the Lake House was appraised over $200,000 more than the sale price from WDAH. Presumably, the Board viewed this as a sound investment.

The government simply does not like the fact that the Non-Profit leased these properties from WDAH. Their dislike of the transaction does not make it a crime. None of these proceeds were obtained by fraud. Lawyers, accountants, external auditors and board members knew of the existence of these properties for years and were aware of and approved the eventual sale to the Non-Profit. Tom and Bontiea Goss were assessed and paid all corresponding income tax on their personal use of the properties in question. The proceeds of the sale to the company, coupled with the rents paid over time, for which the Non-Profit received some value, should not be assessed as the proceeds of an alleged embezzlement scheme-because these were not embezzled funds. This was not a scheme wherein Tom or Bontiea Goss retired to one of these homes. If it were, they would have just kept their ownership interest rather than selling it to the Non-Profit when asked.

**Mr. Goss Did Not Steal Non-Profit Funds By Improperly Relying On The Use Of Charter Flights To/From Colorado.**

The government asserts that Mr. Goss stole Non-Profit funds representing the value of use of a charter air service to travel related to the organization. Mr. Goss resided in Colorado, working remotely at times and traveling frequently to Springfield, Missouri, and other locations related to

the performance of his job duties at the Non-Profit. On some occasions, Mr. Goss relied on the air charter service to transport him to different Non-Profit owned locations, as they were geographically spread over three states. Many of these flights were for business usage. It is first important to point out that the Non-Profit, in the early 2010's, owned its own private aircraft which was used for the same purposes as the charter service, facilitating the travel of Non-Profit executives and employees who needed to attend meetings and facilities in person. The Board of Directors recognized the time commitment and physical toll associated with any employee constantly driving to different locations. In fact, during 2015, after the merger with PFH, and at the insistence of the new CEO, Michael Schwend, the Non-Profit added two additional planes under its ownership structure to facilitate travel for the same reasons as stated above. (Though the ownership of three planes by the Non-Profit at the direction of other leadership has earned no mention by the government).

The real issue at hand is not that Tom and Bontiea Goss were traveling without the permission or knowledge of the Board of Directors, thereby "stealing" funds from the Non-profit by using the charter service, the issue relates directly to whether use of the charter service represents a taxable fringe benefit creating taxable income for Tom and Bontiea Goss for personal flights through the application of IRS guidelines. Interestingly, had Tom or Bontiea Goss used the Non-profit owned plane rather than a charter service, it remains unclear whether the government would have suggested this was "stealing" from the Non-Profit, despite the cost of operating either a privately owned plane and a charter are similar. The use of company or charter flights was referenced during a 2008 meeting of the Board of Directors, who encouraged the practice. (Gov. Exhibit 601).

In January of 2015, Bontiea Goss asked newly hired internal auditor Tom Weber (a certified public accountant), to independently evaluate and confirm whether the charter flights including a leg to or from their home in Colorado were considered "business travel" or "personal travel" under IRS guidelines. This is hardly the actions of someone who is allegedly "stealing" money via an alleged improper use of this benefit. Notwithstanding, Weber conducted research of IRS regulations, which he highlighted and attached to a memo in which he determined that the travel of Tom and Bontiea Goss fell under the "business travel" exception by the IRS, thereby not creating a taxable fringe benefit to Tom or Bontiea Goss for use of the flights. (Exhibit TG-48).

At the recommendation of Polsinelli law firm, a corporate aviation use policy was drafted, presented to, and formally adopted by the Board of Directors on October 27, 2016. (Exhibits TG-49, TG-50 & TG-51). This policy expressly authorized personal use of corporate aircraft by its executives, and clearly signified the Board of Director's continuing intent to make aircraft available for personal use by the Non-Profit's leadership team. Additionally, the employment contracts of Tom and Bontiea Goss executed in July 2015 also expressly authorized the use of aircraft for personal use. (Gov. Exhibits 7 & 13).

On March 13, 2017, at the recommendation of Polsinelli law firm, Weber emailed Jim Lewis, a CPA with the accounting firm KPM, LLP in Springfield, seeking a second opinion as to whether the personal charter flights used by Tom and Bontiea Goss constituted a taxable fringe benefit which should have been included in Tom and Bontiea Goss' W-2's for the affected years. (Exhibit TG-52). Lewis' partner, Becky Harmon researched the issues in a detailed four page memo, and it was ultimately concluded that because Tom and Bontiea Goss chose to live in Colorado and were not required to live there by the Non-Profit, the flights in question represented a taxable fringe benefit. (Exhibit TG-53). Weber then worked with the attorneys to calculate the

value of the flights in the affected years relying on the IRS approved SIFL method and created amended W-2's for Tom and Bontiea Goss, which included the SIFL value of the personal flights in their income. (Exhibit TG-55). Weber separately informed external auditor Marc Behrens, Seim Johnson, of the aircraft usage and explained the additional income assessed to Tom and Bontiea Goss, as well as Marylin Nolan. (Exhibit TG-56). None of the external attorneys or external auditors expressed any concern that the value of these flights constituted "stolen" funds.

After receiving the amended W-2's in 2017, Tom and Bontiea Goss voluntarily amended their tax returns for 2014-2016, paying the additional income tax, penalties and interest assessed. (See Gov. Exhibits 2444, 2445 & 2446). The IRS accepted these amended returns and the accompanying income taxes, penalties and interest paid by Tom and Bontiea Goss.

The government suggests that the Board of Directors only gave formal approval for use of personal charter flights once a new employment contract was entered into with Tom and Bontiea Goss in July, 2015, which expressly authorized the use of the plane for business **or personal** reasons. As noted, in 2016, the Board of Directors adopted a more comprehensive aviation policy which expressly authorized the use of private aircraft for business and personal use, provided the personal use was correctly reported the latter as a fringe benefit in the form of income, using the Standard Industry Fare Level (SIFL) method for calculating the value of flights. These actions ratify the board's intent and continuing approval-stated as early as 2008-of the use of privately owned aircraft for personal travel by leadership of the Non-Profit. The government also omits any reference to the Michael Schwend, the CEO's use of corporate aircraft for personal travel as further evidence of the board's intent to allow such a fringe benefit. Nor does it mention Schwend's employment contract required the Non-profit to provide a car valued at $80,000, a country club

membership and St. Louis Cardinals season tickets.[11] (Exhibit TG-57). In fact, according to flight logs obtained from Polsinelli law firm and government records, the vast majority of personal flights using corporate aircraft were taken by Schwend. (Exhibit TG-58). It is disingenuous for the government to suggest that one day prior to the execution of an employment contract which expressly authorized the use of private aircraft, that Tom and Bontiea Goss were "stealing" from the Non-Profit through their use of the service. If that had been the belief of the Board of Directors, they would not have ratified an express agreement stating otherwise immediately thereafter.

Tom and Bontiea Goss had every reason to believe the usage of the charter flights was authorized and reasonable and were relying on the advice of the Non-Profit's internal auditor. Tom Weber, a CPA, provided a written advisory opinion that the flights should be treated as business flights. It was only after attorneys and second opinions from external CPA firms that it was determined these flights should have been treated as taxable fringe benefits. Mr. Goss has long since paid income tax on the personal usage assessed. This does not constitute a crime.

## **Mr. Goss Did Not Steal From The Non-profit Through The Payment Of Pro1 Warehouse Rent.**

Tom and Bontiea Goss owned a minority interest in Pro1, a thermostat company. In 2014, Pro1 was relocating its shipping warehouse, and was considering Springfield, Missouri as a possible location. Simultaneously, the Non-Profit was actively seeking corporate partners who would enter into a relationship in which they would agree to hire and train persons placed through the Non-Profit via a Missouri state workforce placement program. The persons who were candidates for the employment placement program included persons who were recently out of

---

[11] While these benefits are distasteful to the government, they are not evidence of criminal wrongdoing and are routinely treated as taxable fringe benefits when provided to executives in comparable non-profits.

prison/jail, and on probation; persons recovering from drug/alcohol addictions; persons who had mental disabilities, and disabled veterans, among others. Because each of these categories of candidates suffered from an addiction or personal history that disqualified them from most employment opportunities, the workforce program was designed to find jobs for these persons in positions, and to train them for other jobs. To qualify for reimbursement for administering the program, the Non-Profit was required to place the employees in a specific job, or to secure on the job training for them (so they could seek a similar job from another employer). Fees were paid by the State to the Non-Profit for milestones achieved by each employee (duration in the job, successful completion of training, etc.).

Contrary to what is stated in the government's sentencing memorandum, there were few corporate partners willing to offer jobs to these persons through the Non-Profit. Pro1 was asked to participate and offered an incentive in the form of rent subsidies for a period if they would allow placement of these high risk employees by the Non-Profit, thereby facilitating a successful program. Pro1 hired more than fifty (50) employees through this program. (Exhibit TG-145, p. 81). Pro1 later hired twenty-two (22) disabled youths during a two year period, placed through the Missouri Summer Youth Program administered by the Non-Profit. (Exhibit TG-59). In 2014, Pro1 was the only partner who accepted youths from the Non-Profit, though the number of participating partners increased in later years. (Exhibit TG-59). It is true that the Non-Profit paid rents on behalf of Pro1 at the warehouse from July 2014 through August 2017 for its participation in the program. It is also true that the Non-Profit earned far more in fees from administering the program than the costs it subsidized for Pro1. The government suggests that the Non-Profit engaged in this relationship only to "bolster Pro1's profits." This is untrue, as Pro1 both paid employees and provided health insurance benefits at significant cost to Pro1. Pro1 also allowed employees to host

Alcoholics Anonymous and Narcotics Anonymous meetings at the warehouse and made clean space available for mandatory drug testing for individuals on probation or parole. The payment of these employee benefits was atypical for similar jobs in the region, and certainly was not intended to "bolster" Pro1's profits.

In fact, the Pro1 partnership was so successful, in 2015 the Non-Profit received a national achievement award from Dartmouth College, as well as receiving the "2015 Outstanding Performer in Employment Award" from the Missouri Department of Mental Health, Division of Behavioral Health. These awards were based on the placement and support of persons with drug addictions at the Pro1 warehouse. (Exhibit TG-60).

The government also suggests the Non-Profit had other willing partners who could have participated in this program but cites none. The truth is that most employers were unwilling to employ the high risk individuals placed through the program. Jason Briggs, who managed the program at the Pro1 warehouse told the government during an interview that the Non-Profit entered an agreement with Mercy Hospital for an on the job program, but unlike Pro1, the trainees were not paid by Mercy, just trained for future job opportunities. (Exhibit TG-59). Briggs cited another partner, "All About Auto" which placed program employees between 2016-18 and recalled that the Non-Profit subsidized the partner $300 per month to participate in the program. (Exhibit TG-59). As time passed, there was very little turnover with the program, leading to a reduction in rent subsidies as corresponding revenue from the program diminished. The rent subsidy program was eventually discontinued.

It is true the relationship between the Non-Profit and Pro1 was beneficial, but it benefitted both sides. Pro1 received rent subsidies in return for its participation, and the Non-Profit was able to successfully place underrepresented job candidates who otherwise could not keep employment,

earning fees far in excess of the costs in return. Most importantly, these individuals were restored as productive wage earning members of society. While the government suggests this relationship somehow represents an embezzlement by Mr. Goss-nothing could be further from the truth. Further, the services conducted at Pro1 were a vital part of grants administered by the Chairty that resulted in approximately $2.6 million in revenue to the Non-profit from 2014-2017.

**Mr. Goss Did Not Conceal The Theft Of Over $2 Million Dollars From The Non-Profit By David Hayes.**

In yet another issue not referenced within the PSR or addendum, David Hayes was a Certified Public Accountant and former Board of Directors member, who served as the internal auditor of the Non-Profit from the early 2000's until he was fired by Mr. Goss in June 2014. Hayes suffered a heart attack in January 2014 and was largely absent until his termination. On June 12, 2017, Hayes entered a plea of guilty before this Court in which he admitted embezzling and stealing $1,965,476.81 from the Non-Profit between January 3, 2011 and March 31, 2014. (Gov. Exhibit 21). The plea agreement with the government contained a fact basis which included the following statement:

> 7)  From January 3, 2011 through March 31, 2014, said dates being approximate, Hayes devised and executed a scheme to embezzle, steal, obtain by fraud, and without authority knowingly convert to his own use funds that were under the care, custody, and control of AO.

(Gov. Exhibit 21).

Neither Tom nor Bontiea Goss were referenced within the plea agreement. Hayes also pleaded guilty to embezzling and stealing more than an additional $1 million dollars from the

Miami Tribe of Oklahoma and Carnahan-White Fence and Iron, Inc. Hayes also pleaded guilty to tax evasion.

Hayes admitted that he issued unauthorized checks from the Non-Profit to he or a family member without authority. Hayes also concocted an elaborate scheme to cover his theft from detection. In 2013, several companies in Arkansas owned by the Non-Profit owed back payroll taxes to the U.S. Treasury and State of Arkansas. Because the Non-Profit had a low cash balance in its account and was worried about tax garnishments affecting its limited cash reserves and ability to make payroll, David Hayes offered to issue checks to the state and federal tax authorities as payment for the delinquent taxes and seek reimbursement from the Non-Profit as soon as sufficient programmatic revenue was received. Hayes was eventually "reimbursed" in an amount of approximately $1,630,000 by the Non-Profit. (See Exhibits TG-61 & TG-66). Initially, Hayes failed to produced verification of the issuance of checks to the U.S. Treasury and State of Arkansas. (Exhibit TG-62). After repeated demands, including those from Mr. Goss, Hays provided what he represented to be images of cancelled checks issued to government agencies in support of the previously reimbursed payments. (See Exhibits TG-63, TG-64 & TG-65). These checks were later determined to be fraudulent by the government investigators. An example of one of the checks presented by Hayes in support of the reimbursement scheme is depicted below:



(Exhibits TG-64 & TG-65). Weber contacted Hayes directly about producing additional records related to the reimbursement. (Exhibit TG-66). The government suggests this embezzlement "was not complicated" and cited a simple example of a reimbursement check payable to Hayes. To the contrary, as seen in the image above, Hayes went to great lengths to fabricate fictitious checks, even imprinting the purported endorsement and bank routing numbers of the U.S. Treasury/IRS on the back of the individual checks. In looking at these checks objectively, the average person would be highly unlikely to know they were fraudulent. (Further, not unlike the Non-Profit, it would seem Hayes was successful in actively hiding his crimes from the other two victims listed in his plea agreement until government investigators uncovered the theft). (See Exhibit, TG-157, Kimbrough Aff.). No one within the Non-Profit detected the fraud before his guilty plea was entered.

After Hayes provided this series of checks in support of the purported payment of taxes, the Non-Profit's accounting department was satisfied in their belief that the reimbursements were legitimate. Weber, during an interview with the government, stated he discussed the tax reimbursement process with Brian Green, an external auditor with Seim Johnson, who indicated he was satisfied with the proof of payment provided by Hayes to the Non-Profit. (Exhibits TG-31, p. 90 & TG-32, pp. 106-108). As such, there were no audit concerns related to the event. (Exhibits TG-31, p. 90 & TG-32, pp. 106-108).

The government suggests that Tom and Bontiea Goss suspected Hayes of stealing Non-Profit funds as early as 2011 and covered up this evidence, pointing to a single email in which Bontiea Goss informed Jeff Morris, Non-Profit counsel, that Mr. Goss had mentioned a suspected theft by Hayes to Chip Sheppard, another attorney. Although Morris interpreted this comment to mean Mr. Goss suspected the Hayes theft, Mr. Goss was referring to excessive monies paid at Hayes' direction several years earlier in relation to the construction of a building in Lamar, Arkansas owned by Northwest Arkansas Property Management Group (NWAPMG). Goss told Morris and others that he suspected Hayes may have stolen money through false dirt work invoices but had no direct proof and did not pursue the matter further. NWAPMG is privately owned. Goss later explained this to Morris during multiple interviews. Weber also expressed concerns about the cost of the dirt work during an interview with the government. (Exhibit TG-31, pp. 185-188). Mr. Goss also told the accounting team to "get Tom Weber involved to look at it," if the bookkeepers were not satisfied with the records produced by Hayes. (Exhibit TG-67).

Further, following Hayes' plea of guilty, the government conducted a total of nine (9) separate interviews on different dates with David Hayes, which were not recorded, but were memorialized in various government memoranda. In the nine interviews conducted, Hayes told

government agents he did not know if Tom or Bontiea Goss ever suspected him of wrongdoing. Hayes also confirmed that Mr. Goss questioned Hayes about the IRS payments and asked him to provide documentation in support of same. (Exhibit TG-178). Hayes later took his own life before he was sentenced. It should also be noted that the Non-profit submitted an insurance claim associated with the theft, and after an investigation by the insurer, received repayment of $500,000.00 in insurance proceeds related to funds stolen by Hayes. (Exhibit TG-68).

The government acknowledges, in its sentencing memorandum that Tom or Bontiea Goss did not benefit financially from Hayes' theft but suggest their motivation in not investigating Hayes themselves was to avoid scrutiny of their own alleged misdeeds. Notwithstanding the government's acknowledgement that Tom or Bontiea Goss received no funds through Hayes' theft, the government asks this Court to hold Tom and Bontiea Goss accountable for the $2 million dollar loss attributed to Hayes' theft. This argument is meritless and without a supporting factual basis.

**<u>The Court Should Consider Forfeiture In Lieu Of Restitution</u>**

The plea agreement states that any imposed renumeration to the United States (or other party) should be in the form of a forfeiture judgment. The government sought inclusion of this specific language in the plea agreement. In its sentencing memorandum, the government now requests any judgment be in the form of restitution, rather than forfeiture. Mr. Goss' primary concern is the Court imposing an amount of renumeration based on fact and fairness.

Mr. Goss disagrees that the financial judgment sought by the government should be $4,350,000 between he and Mrs. Goss. The government suggests in its sentencing memorandum that these funds were "embezzled, misused and obtained by fraud, and are all losses to the government." (Gov. Sent. Memo p. 75). This is simply not accurate. Aside from the value of the kickback and bribes further described below, federal funds awarded to the Non-profit were used

63

for the administration of programs intended. In other words, the government received the benefit for which it bargained with the Non-profit when it awarded federal funds. The government has not established any evidence that the Non-profit did not provide all services for which it was awarded funds. In addition, the government and the State of Arkansas has already received forfeitures and restitution funds for the very same issues they are alleging the Gosses are responsible for. In fact, the government has received forfeitures amounts from others far exceeding any proceeds traceable to the Crimes Tom Goss was involved in.[12]

Further, the government has stated through the PSR that it is unable to determine who a victim is, other than the United States. The United States received the benefit of services rendered by the Non-profit pursuant to any government funds expended. All government funds and grants were entered on the books and records of the Non-profit and accounted for. Since all government funds and grants were expended exactly as required, any funds misappropriated would have been derived from the surplus revenue the Non-profit generated. The government is unable to identify a victim because government funds were simply not stolen by Mr. Goss.

Finally, the purpose of forfeiture is to divest monies or property which constitute or are derived from proceeds of a crime. *See generally United States v. Jennings*, 487 F.3d 564 (8th Cir. 2007). As described further within, the Court should only order property forfeited commensurate with identifiable proceeds of his crimes. Mr. Goss suggests there is no basis or reason to deviate or stray from the terms of the plea agreement which requires forfeiture of an amount to be determined by the Court. The government has failed to demonstrate that most of the funds it seeks through forfeiture or restitution were "proceeds of a crime" involving Mr. Goss. For example, the

---

[12] In addition, the Non-profit is pursuing a civil lawsuit against Mr. and Mrs. Goss related to many of the issues addressed in this sentencing hearing.

64

Hayes theft, rents, car leasing, Pro1 relationship, charter flights, sale of homes or hypothetical programmatic revenue related to legislative acts were not proceeds of a crime.

## Calculation Of Loss Caused By Mr. Goss

The final PSR states that the correct "guideline for a violation of 18 U.S.C. § 371 is located at U.S.S.G. § 2C1.1…." PSR at 21, ¶ 80. Part of the offense conduct described in the defendant's plea agreement relates to an underlying violation of 18 U.S.C. § 666(a)(2), related to theft or bribery concerning programs receiving federal funds. 18 U.S.C. § 666(a)(2) corresponds to U.S.S.G. § 2C1.1. In the final PSR, a loss amount of $5,269,843.83 was improperly applied using U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(J). A review of § 2C1.1(b)(2) describing loss includes "the value of the payment, the benefit received or to be received for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, by increasing the number of levels from the table in § 2B1.1(b)(1) corresponding to that amount." See § 2C1.1(b)(2). The PSR incorrectly determined this amount was $5,269,843.83 and applied an adjustment of +18 levels on the basis that the amount defined in § 2C1.1(b)(2)(J) was greater than $3,500,000. The chart below depicts the loss amounts described in the PSR.

**Loss Alleged in Final PSR:**

| SCHEME | Method | VALUE/LOSS |
|---|---|---|
| Bribes to Hutchinson, Wilkins & Jones | Value of Payments | $ 1,241,957.28 |
| Personal Assistant Wages | Net Value of Benefit | $190,714.58 |
| Rental Car Scheme | Net Value of Benefit | $1,132,424.55 |
| Proceeds from Luxury Homes | Net Value of Benefit | $ 877,322.81 |
| Receipt by Tom Goss of kickbacks | Value of Payments | $356,350.00 |
| Charter Flights | Net Value of Benefit | $ 348,419.68 |
| Receipt of GIF Funds by Charity | Net Value of Benefit | $ 1,122,654.93 |
| Total: | | $5,269,843.83 |

(Revised PSR, Document 322)

      In its sentencing memorandum, the government now alleges a new total loss amount of $9,262,975.07, much of which derives from numbers not otherwise referenced within the final PSR. The evidence does not support a finding of a loss in either of these amounts. The enhancement under § 2C1.1(b)(2) should be based on an amount commensurate with *the bribes paid* and the *value of the benefit received* or to be obtained by a public official. Further, in the commentary to § 2C1.1, Application Note 3 defines loss as the *net value* of the benefit received. The chart below depicts the loss amount suggested within the government's sentencing memo.

**Loss Amounts Alleged In Government Sentencing Memorandum**

| SCHEME | METHOD | VALUE/LOSS |
|---|---|---|
| **Bribes to Jeremy Hutchinson** | **Value of Payment** | **$ 379,500.00** |
| **Bribe to Wilkins** | Value of Payment | **$ 30,000.00** |
| **Bribe to Woods** | **Value of Payment** | **$ 90,000.00** |
| **RSPMI (Hutchinson)** | **Net Value of Benefit** | **$1,824,597.47** |
| **Episodes of Care (Hutchinson)** | **Net Value of Benefit** | **$1,867,552.17** |
| **PRO1 Warehouse Rent** | Net Value of Benefit | $ 132,500.00 |
| **Kickback Scheme: Cranford to the Gosses** | **Net Value of Benefit** | **$ 735,875.00** |
| Rental Car Scheme | Net Value of Benefit | $1,132,424.55 |
| Sale of Mountain House | Net Value of Benefit | $ 306,472.81 |
| Rents for Vacation and Retirement Homes | Net Value of Benefit | $ 570,850.00 |
| **Charter Flights** | **Net Value of Benefit** | **$ 181,814.70** |
| **Concealment of Hayes Embezzlement** | **Net Value of Benefit** | **$2,011,388.37** |
| Total: | | **$9,262,975.07** |

*(Yellow highlights signifies new or different loss $ value than PSR).*

(Gov. Sent. Memo, Doc. 343).

As described within, the defendant caused issuance of a check to St. James United Methodist Church in an amount of $30,000, and Mr. Goss participated in the hiring of Woods' fiancé for an annual salary of $70,000, each in return for actions by the two legislators. Mr. Woods' fiancé voluntarily resigned from employment after four months to take another job. At most, the loss calculation commensurate with the bribe paid in relation to Mr. Woods should be $23,333.33 (four months' salary). This combined amount, $53,333.33, represents the value of the bribes paid by Mr. Goss. In further assessing the value of the benefit provided by Wilkins and Woods, neither "the benefit received or to be received" or "value of anything to be obtained" are applicable in the instant case. The respective GIF grants were recommended by Woods and Wilkins and awarded in an amount totaling $1,122,564.93. Of these funds, $1,122,564.93 was spent <u>exactly as required</u>

67

<u>by the grants</u> for programs benefitting the citizens of Arkansas. The defendant asserts that pursuant to U.S.S.G. § 2C1.1, Application Note 3, inclusion of any portion of the $1,522,564.93 (or any loss other than described herein) in a calculation under U.S.S.G. § 2C1.1(b)(2) is improper. As such, this amount should not be included as loss.

Because there was no net value or funds received by the defendant from the awarding of the grants by Wilkins and Woods (which were spent by the Non-profit as required), the total loss related to Wilkins and Woods is $53,333.33. This corresponds to an enhancement within the table at § 2B1.1(b)(1)(C) of four levels. Monies received from the kickbacks received are discussed further herein.

**<u>Loss Amounts Proposed By Tom Goss</u>**

| SCHEME | Method | VALUE/LOSS |
|---|---|---|
| | | |
| **Bribe to Wilkins** | **Value of Payment** | **$ 30,000.00** |
| **Bribe to Woods** | **Value of Payment** | **$ 23,333.33** |
| **Kickback Scheme: Cranford to Goss** | **Net Value of Benefit** | **$ 356,350.00** |
| **Value of Charter Flights (2013)** | **Net Value of Benefit** | **$4,052.00** |
| **Total Aggregate Value:** | | **$413,735.33\*** |

\*For loss calculation under U.S.S.G. §2C1.1(b)(2), loss should be limited to the value of the bribe paid and net loss resulting from same.

With regard to Hutchinson, as noted within this memorandum, Mr. Goss had little or no contact with Hutchinson and did not engage his services on behalf of the Non-profit. Should the Court disagree, Mr. Goss submits that Hutchinson did engage in some legal work at the request of the Non-profit. Some of this work was unquestionably poorly executed. Notwithstanding, it is reasonable to conclude some of Hutchinson's fees were paid in relation to legal work he was expected to perform. Because Mr. Goss was not responsible for the hiring of, payment or control over Hutchinson, he should not be held accountable for a loss associated with Hutchinson.

Alternatively, should the Court decide to hold Mr. Goss responsible for the bribery of Hutchinson by others, Mr. Goss respectfully submits that the Court consider a reduced value of Hutchinson's retainers as a representative loss. Mr. Goss acknowledges that such a finding by the Court, if made, would undoubtedly be included in any calculation related to the forfeiture or restitution for purposes.

The government suggests various other amounts should be included in the total "loss" under application of U.S.S.G. § 2C1.1, including funds received from the kickbacks received ($356,350), as well as every additional dollar figure suggested in the revised PSR or their sentencing memorandum. Inclusion of the kickback funds acknowledged by Mr. Goss in an amount of $356,350 as an enhancement under U.S.S.G. § 2C1.1 and the corresponding table found at § 2B1.1(b)(1) would be an improper application of the guidelines.

The numerous revisions to the "loss" calculation proposed by the government in its sentencing memorandum is alarming. This case has been under investigation and/or indictment for well over five years. After the initial PSR stated that the "full amount of loss cannot be determined," an amount totaling $5,269,843.83 was subsequently proposed as loss in the PSR addendum. However, weeks before sentencing, the government has proposed almost an entirely different set of loss amounts, presumably in response to Mr. Goss' PSR objections to the original amounts, with a new total alleged loss of $9,262,975.37. Many of the loss amounts alleged are highly speculative, at best. This change signifies uncertainty as to the true loss amounts, and is understandably concerning for Mr. Goss, who is reliant on the Court to assess and decide what the correct loss number is. Mr. Goss understands that the Court must make a reasonable estimation of loss, based on the facts and evidence available. *See United States v. DeRosier*, 501 F.3d 888 (8th

69

Cir. 2007). The lack of continuity in the government's proposed loss amounts should be considered by the Court when assessing the validity of the proposed numbers.

U.S.S.G. § 2C1.1 contains a strict definition of loss-it must include the value of the bribe or net proceeds received from the bribe. Although U.S.S.G. § 2C1.1(b)(2) refers to the table found at § 2B1.1(b)(1) to determine the total aggregate loss due to the bribes/benefit analysis-that referral is only for the purpose of aggregating the value of the bribe or net proceeds received from the bribe. U.S.S.G. § 1B1.5(b)(2) instructs, "an instruction to use a particular subsection or table from another offense guideline refers *only to the particular subsection or table referenced*, and not to the entire offense guideline." Application Note 2 to § 1B1.5 then refers us back to the commentary of § 2C1.1 for interpretation.

In other words, the government seeks to pick and choose various sentencing enhancements from different guideline provisions to aggregate a larger sentence than would otherwise be required. For example, the kickback payments ($356,350) should be calculated by applying U.S.S.G. § 2B1.1, not § 2C1.1. Embezzled funds derived from a different criminal act not "loss" as defined by § 2C1.1. The prospective sentence for the conduct related to the kickback payments should be tallied separately based on the associated conduct of each alleged scheme and grouped with the guidelines related to § 2C1.1, relying on the greater of the two respective guideline calculations. The recommended punishment afforded under U.S.S.G. § 2C1.1 is greater and far more serious than any calculation under U.S.S.G. § 2B1.1. The sentencing court is still free to consider the total aggregate amount it finds in imposing a reasonable sentence, however, improperly applying losses unrelated to bribery under § 2C1.1 when calculating the monetary enhancement provision is improper. Under U.S.S.G. § 2C1.1, the loss amount is restricted to the

definition of loss contained within § 2C1.1, which is $53,333.33. This would represent a six level enhancement to the § 2C1.1 guideline calculation for Mr. Goss.

The Court is clearly free to consider relevant conduct when formulating how much forfeiture should be allocated to Mr. Goss. To that end, Mr. Goss respectfully asks the Court to adopt his suggested calculations.

In sum, the total aggregated value of the bribes and benefits received should as the result of Mr. Goss' conduct was $409,683.33. Income taxes were paid in an approximate amount of $123,938.53. Mr. Goss suggests an amount based on these calculations should be ordered as forfeited to the United States.

Finally, Mr. Goss respectfully submits that in considering the whole of the facts and arguments presented in his Sentencing Memorandum and presentation at the sentencing hearing, the proper sentence to be imposed for his conduct should be at or near the low end of the statutory range of punishment, with any sentence to run concurrently with one another.

Respectfully submitted,

/s/ *Christopher Plumlee*

Christopher D. Plumlee
Wendy L. Johnson
*Admitted Pro Hac Vice*
RMP LLP
5519 Hackett St., Ste. 300
Springdale, AR 72762
(479) 443-2705
cplumlee@rmp.law; wjohnson@rmp.law

Brian Malkmus, Malkmus Law Firm, LLC
305 Park Central W.
Springfield, MO 65806
(417) 447-5000
blamkmus@malkmuslaw.com
*Attorneys for Tommy Ray Goss*

71

## **CERTIFICATE OF SERVICE**

I, Christopher D. Plumlee, hereby certify that on March 20, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing and a copy of the filing to all counsel of record.

*/s/ Christopher Plumlee*
Christopher D. Plumlee

# EXHIBITS TG 1 – TG 204

Originals maintained in the Clerk's Office

Please see "Notice of Exhibit Attachment"