# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

BONTIEA BERNEDETTE GOSS and
TOMMY RAY GOSS,

          Defendants.

**Case No. 19-03048-01/02-CR-S-BCW**

## UNITED STATES' JOINT REPLY SENTENCING MEMORANDUM

The United States of America, by and through Teresa A. Moore, United States Attorney
for the Western District of Missouri, and undersigned Assistant United States Attorneys, and the
Public Integrity Section of the United States Department of Justice, Criminal Division, through
Chief Corey R. Amundson, and the undersigned Criminal Division attorneys, respectfully submits
this reply sentencing memorandum, addressing issues raised in the sentencing memorandums
filed by the defendants Bontiea Goss (herein B. Goss) and Tommy Ray Goss (herein T. Goss)
and assisting the Court in its final Guideline restitution and forfeiture calculations and the ultimate
sentence.

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ........................................................................... iv

FACTUAL AND LEGAL ANALYSIS .............................................................1

   A. The Government's Request for a Joint Sentencing Hearing.............................1

   B. Determining the Total Offense Level as to Count 1 ........................................1

      1. +12 Offense Level is Applicable to Both Defendants under U.S.S.G. § 2C1.1(a)(1)...............................................................................................1

      2. Application of Specific Offense Characteristics under U.S.S.G. § 2C1.1(b) ...............................................................................................................1

         a. +2 Level Enhancement is Applicable to Both Defendants Because the Offense Involved More than One Bribe or Extortion under U.S.S.G. § 2C1.1(b)(1)...........................................................................................1

            i. Tom Goss ..................................................................................1
            ii. Bontiea Goss .............................................................................2

         b. +16 Level Enhancement under U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(1) is Applicable for Both Defendants for the Expected or Actual Benefits Received from the Bribes.......................................................................4

            i. Estimated Value received from Bribes to Senator Hutchinson .5
            ii. Estimated Value received from Bribes to Senator Woods and Representative Wilkins .............................................................9
            iii. The Bribes to Hutchinson, Woods and Wilkins, and the Direct Value of those Bribes Supports a Relevant Conduct Determination under U.S.S.G. § 2B1.1(I) of 16 ....................12

         c. +4 Level Enhancement under U.S.S.G § 2C1.1(b)(3) ........................13

3.   +4 Level Enhancement for an Aggravating Role as an Organizer or Leader of a Criminal Activity Involving Five or More Participants or was Otherwise Extensive under U.S.S.G. § 3B1.1(a) is applicable to Both Defendants ..................................................................................................13

4.   The Total Offense Level for Count 1 after Acceptance of Responsibility for both Defendants should be at Least a Level 35, with an Advisory Guideline Range of 168 to 210 months ....................................................15

   a.   Government's Calculations................................................................15

C.  Defendants' Third-Party Transactions with the Charity Acted to Embezzle Government Funds from the Charity and can be Considered by the Court in Sentencing.......................................................................................................17

1.   The Rental Car Scheme ..............................................................................18

2.   The Lake House and Mountain House Scheme..........................................19

3.   The Charity loaned funds to the Defendants' various for-profit companies ...................................................................................................21

4.   Alleged Tax Losses do not Mean that the Defendants did not Benefit from the Charity's Relationship with their For-Profit Companies .....................22

D.  Both Defendants Should Pay Fines for their Crimes.......................................24

E.  The Defendants Should Pay either Restitution or Forfeiture or a Combination in their Cases....................................................................................................24

1.   The Court Should Order the Forfeiture of $562,864.13 as the Defendants' Share of the Charity's Gain from Episodes of Care scheme ....................26

2.   The Court Should Order the Defendants to Pay in Restitution for the Cost of the Bribes Paid to Senators Hutchinson and Woods and Representative Wilkens, to the Extent not Already Paid by Other Codefendants..............27

3.   The Court Should Order the Defendants to Pay in either Forfeiture or Restitution the Payments to Cranford and the Kickbacks to the Defendants ...................................................................................................27

4.  The Court Should Order the Defendants to Pay in Forfeiture the Funds Received from the Third-Party Transactions involving WDAH ...............27

5.  The Court Should Order the Defendants to Pay in Forfeiture the Benefit Received from the Charter Flights Paid for by the Charity .......................28

6.  The Government's Total of Forfeiture and Restitution Sought against the Defendants ................................................................................................28

F.  Defendants' and Government's Variance Requests from the Advisory Guideline Range and Sentencing Arguments ..................................................29

1.  The Defendants' Argument for Variance Consideration ...........................29

a.  The Defendants' Service to the Disadvantaged as Part of their Work with the Charity does not Support a Variance or Serious Sentencing Consideration ..................................................................29

b.  The Defendants' Charitable Actions, Gifts, and Service to Family and Friends do not Support a Variance or Serious Sentencing Consideration ..................................................................................31

c.  Defendant T. Goss' Grief for his Son's Death does not Support a Variance or Serious Sentencing Consideration..............................32

d.  Both the Defendants' Concerns about their Medical Care in the BOP do not Support a Variance or Serious Sentencing Consideration ...33

2.  Government's Argument for Upward Variance ........................................34

a.  Nature of the Offense ....................................................................34

b.  Proportionality Concerns ...............................................................35

c.  Lack of Remorse ...........................................................................36

CONCLUSION....................................................................................................39

CERTIFICATE OF SERVICE ............................................................................40

# TABLE OF AUTHORITIES

Page(s)

Cases

*United States v. Repking,*
467 F.3d 1091 (7th Cir. 2006) ................................................................31, 32

*United States v. McHan,*
920 F.2d 244 (4th Cir. 1990) ................................................................32

*United States v. Ali,*
508 F.3d 136 (3d Cir. 2007) ................................................................31

*United States v. Arshad,*
239 F.3d 276 (2d Cir. 2001) ................................................................2, 3

*United States v. Boccagna,*
450 F.3d 107 (2d Cir. 2006) ................................................................25

*United States v. Broxmeyer,*
699 F.3d 265 (2nd Cir. 2012) ................................................................38

*United States v. Butler,*
646 F.3d 1038 (8th Cir. 2011) ................................................................3, 5, 10

*United States v. Channon,*
973 F.3d 1105 (10th Cir. 2020) ................................................................25

*United States v. Clausen,*
949 F.3d 1076 (8th Cir. 2020) ................................................................25

*United States v. Cohen,*
171 F.3d 796 (3d Cir. 1999) ................................................................3

*United States v. Contorinis,*
692 F.3d 136 (2d Cir. 2012) ................................................................25

*United States v. Cooper,*
394 F.3d 172 (3d Cir. 2005) ................................................................31

*United States v. Cutler,*
520 F.3d 136 (2d Cir. 2008) ................................................................34

*United States v. DeLaurentis,*
47 Fed. Appx. 170 (3d Cir. 2002) ................................................................34

*United States v. Dijan,*
37 F.3d 398 (8th Cir. 1994) ................................................................15

*United States v. Douglas,*
569 F.3d 523 (5th Cir. 2009) ................................................................38

*United States v. Edwards,*
496 F.3d 677 (D.C. Cir. 2007) ................................................................8

*United States v. Evans,*
30 F.3d 1015 (8th Cir. 1994) ................................................................2

*United States v. Haversat,*
22 F.3d 790 (8th Cir. 1994) ................................................................30, 31

*United States v. Hernandez,*
731 F.2d 1147 (5th Cir. 1984) ................................................................9

Case 6:19-cr-03048-BCW     Document 356     Filed 04/17/24     Page 5 of 48

*United States v. Krause*,
  513 Fed. Appx. 482 (6th Cir. 2013) ............................................................34
*United States v. Landers*,
  68 F.3d 882 (5th Cir. 1995) .......................................................................10
*United States v. McDaniels*,
  19 F.4th 1065 (8th Cir. 2021) ....................................................................32
*United States v. McGinty*,
  610 F.3d 1242 (10th Cir. 2010) .................................................................24
*United States v. Neil*,
  903 F.2d 564 (8th Cir.1990) ......................................................................30
*United States v. Overbey*,
  696 F.3d 702 (8th Cir. 2012) .....................................................................38
*United States v. Petruk*,
  484 F.3d 1035 (8th Cir. 2007) .............................................................25, 26
*United States v. Reyes*,
  239 F.3d 722 (5th Cir. 2001) .....................................................................34
*United States v. Richard*,
  775 F.3d 287 (5th Cir. 2014) .......................................................................5
*United States v. Sabri*,
  326 F.3d 937 (8th Cir. 2003) .................................................................9, 17
*United States v. Sapoznik*,
  161 F.3d 1117 (7th Cir. 1998) ...................................................................11
*United States v. Senty-Haugen*,
  449 F.3d 862 (8th Cir. 2006) .....................................................................25
*United States v. Shenberg*,
  89 F.3d 1461 (11th Cir. 1996) ...................................................................34
*United States v. Siegelman*,
  640 F.3d 1159 (11th Cir. 2011) .................................................................34
*United States v. Stefonek*,
  179 F.3d 1030 (7th Cir. 1999) ...................................................................32
*United States v. Thurston*,
  358 F.3d 51 (1st Cir. 2004) .......................................................................32
*United States v. Vega-Cervantes*,
  666 Fed. Appx. 841 (11th Cir. 2016) .........................................................35
*United States v. Vrdolyak*,
  593 F.3d 676 (7th Cir. 2010) .....................................................................31

Statutes

18 U.S.C. § 666(a)(2) ..............................................................................9, 17
18 U.S.C. § 3553 .........................................................................................39
18 U.S.C. § 3663A(a)(1) .............................................................................25
18 U.S.C. § 3663A(a)(3) .............................................................................24
28 U.S.C. § 2461(c) ....................................................................................24
18 U.S.C. § 666 ...........................................................................................9

Rules

U.S.S.G. § 2B1.1.............................................................................4, 8, 12
U.S.S.G. § 2B1.1(b)(1)(J)..........................................................................4
U.S.S.G. § 2B4.1.......................................................................................3
U.S.S.G. § 2C1.1.......................................................................................2
U.S.S.G. § 2C1.1(a)(1)........................................................................1, 16
U.S.S.G. § 2C1.1(b)..................................................................................1
U.S.S.G. § 2C1.1(b)(1).....................................................................1, 4, 16
U.S.S.G. § 2C1.1(b)(2).......................................................................passim
U.S.S.G. § 2C1.1(b)(3).......................................................................13, 16
U.S.S.G. § 3B1.1(a)......................................................................13, 15, 16
U.S.S.G. § 3C1.1......................................................................................16
U.S.S.G. § 5H1.10....................................................................................31
U.S.S.G. § 5H1.11....................................................................................30
U.S.S.G. § 2B1.1(b)(1)(G)......................................................................16
U.S.S.G. § 2B1.1(b)(1)(I)...........................................................5, 9, 12, 16

## I. FACTUAL AND LEGAL ANALYSIS

### A.  The Government's Request for a Joint Sentencing Hearing

The Government is prepared for separate sentencing hearings for both defendants.  The Government in its original sentencing memorandum provided the Court with argument and legal authority as to not only the Court's discretion to hold a joint sentencing hearing, since the issue had not been briefed for the Court, but also reasons why at a minimum, separate *evidentiary* hearings were potentially prejudicial and contrary to the tenets of judicial economy. Accordingly, the Court maintains the authority to order a joint sentencing hearing if persuaded by the Government's legal analysis on the issue.

### B.  Determining the Total Offense Level as to Count 1

#### 1.  +12 Offense Level is Applicable to Both Defendants under U.S.S.G. § 2C1.1(a)(1)

Both defendants and the Government agree with the Presentence Investigation Report that the base offense level is 12, pursuant to U.S.S.G. § 2C1.1(a)(1).

#### 2. Application of Specific Offense Characteristics under U.S.S.G. § 2C1.1(b)

##### a.  +2 level Enhancement is Applicable to Both Defendants Because the Offense Involved More than One Bribe or Extortion, under U.S.S.G. § 2C1.1(b)(1)

##### i.  Tom Goss

The Presentence Investigation Reports (PSR) found that this enhancement applied to both defendants.  (D.E. 317, B. Goss PSR ¶ 80; D.E. 322, T. Goss PSR ¶ 81.)  Defendant T. Goss acknowledges that the enhancement applies to him, because of his bribes to Arkansas State Senator John Woods and Arkansas State Representative Hank Wilkins.  (D.E. T. Goss Sent. Memo. p. 22.) Accordingly, there is no dispute this enhancement applies to Defendant T. Goss. The Government, however, notes for the completeness of the record and consistent with its original sentencing memorandum, that as part of the conspiracy with B. Goss, T. Goss is also responsible for the bribes

paid to Senator Jeremy Hutchinson by B. Goss and co-defendant Rusty Cranford, despite T. Goss's non-credible claims that he was not aware of the actions of B. Goss, Senator Hutchinson, and Cranford. (*See* D.E. No. 343, Gov. Sent. Memo. at pp. 27-30.)

### ii. Bontiea Goss

B. Goss denies that the 2-level enhancement applies in her case. B. Goss asserts that the payments to Senator Hutchinson, which she acknowledges were bribes from Cranford, were simply installments for one action that Senator Hutchinson was providing the Charity: his vote and influence in the Arkansas General Assembly. B. Goss refers to Application Note 2 for U.S.S.G. § 2C1.1, which states that "related payments" "constitute a single incident of bribery" such as "a number of installment payments for a single act." B. Goss also cites to *United States v. Arshad*, 239 F.3d 276 (2d Cir. 2001), in support of her claim that B. Goss and Cranford's payments to Senator Hutchinson were "installment payments for a single act." (D.E. 352, B. Goss Sent. Memo. p. 9.)

B. Goss' analysis is incorrect and has been rejected in this Circuit. *See United States v. Evans*, 30 F.3d 1015, 1020 (8th Cir. 1994). B. Goss's cited case, *Arshad*, supports the Government's position. There, the defendant, a painter hired to paint New York City Housing Authority (NYCHA) residences funded with federal money, bribed a NYCHA Inspector on a regular basis for: 1) " 'approval of his deficient painting work by the painting inspector'; (2) 'authorization for more work hours by the painting inspect[or]'; and (3) expedited approval by the building superintendent of payment for Arshad's past work." *Arshad*, 239 F.3d at 280–81. The Court in *Arshad* noted, regardless of the method and regularity of payment, and the fact the bribes were paid to one person, "the payments were indisputably and undisputedly intended to achieve

several distinct benefits for Arshad and were therefore *more than one bribe irrespective of their manner of payment.*" *Id.* at 282 (emphasis added).

As already detailed in the Government's original sentencing memorandum, the regular payments to Senator Hutchinson were to influence whatever legislation that B. Goss and Cranford asked Hutchinson to influence. The three specific and distinct legislative items that the Government highlighted in its original sentencing memo included Senator Hutchinson's work to: (1) "block" RSMPI reform; (2) "block" the ADHS Initiatives: Episodes of Care and Health Homes; and (3) to add Charity concerns to the language of the Arkansas Criminal Justice Reform bill. (D.E. 343, Gov. Sent. Memo., pp. 19-26.) B. Goss received emails from Cranford detailing the progress of each specific action by Hutchinson and both B. Goss and T. Goss directed language for Senator Hutchinson to place in the Criminal Justice Reform bill to benefit the Charity. (Gov. Sent. Memo. pp. 24-25.) Thus, the payments were for multiple, unrelated actions, like those committed in *Arshad*. The fact that Senator Hutchinson's work on the Arkansas Criminal Justice Reform bill in the end did not provide a tangible benefit to the Charity does not make it any less a bribe. *See United States v. Cohen*, 171 F.3d 796, 804 (3d Cir. 1999) (in interpreting a similar sentencing guideline provision under U.S.S.G. § 2B4.1, the court held that the value of the bribe included "any benefit that the briber expected to receive at the time he paid the bribe, *even if he did not ultimately receive it.*") (emphasis added).

Further, the evidence proffered by the Government establishes that B. Goss knew, or at a minimum, was willfully blind to the bribes made to Senator Woods by T. Goss and Cranford. *See United States v. Butler*, 646 F.3d 1038, 1042 (8th Cir. 2011) (the district court did not clearly err in finding that the recruited individuals knew or were willfully blind to the fraud.) T. Goss

acknowledges that the hiring of Senator Woods fiancé, C.M., for a $70,000[1] per year job, was part of the bribe paid to Senator Woods to obtain the $1,000,000 GIF for the Charity. For her part, B. Goss, in emails between herself, T. Goss, and Cranford, ensured that C.M. was hired for the position and worked with Cranford to provide Senator Woods the final information ensuring that the Charity would receive the $1,000,000 GIF in exchange for the job to C.M. (D.E. 343, Gov. Sent. Memo. pp. 31-32.). For these reasons, the two-level enhancement under U.S.S.G. §2C1.1(b)(1) is applicable to both defendants because the offenses involved more than one bribe or extortion.

### b. +16 level Enhancement Under U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(I) is Applicable for Both Defendants for the Expected or Actual Benefits Received from the Bribes

Both B. Goss and T. Goss objected to the PSR's determination that under U.S.S.G. §2C1.1(b)(2), which cross references U.S.S.G. § 2B1.1, that the total amount implicated by the bribery was more than $3.5 million dollars, which, under U.S.S.G. § 2B1.1(b)(1)(J) increases the base offense level by 18 levels. According to B. Goss, the only amount to be considered should be her own conjecture of $81,000, which she claims is a "reasonable estimate" of her imperfect knowledge of Senator Hutchinson's bribery scheme. (D.E. 352, B. Goss Sent. Memo. p. 38.) According to T. Goss, the only amounts that should be considered for him are the $30,000 in payments made to Representative Wilkins, and a prorated amount of $23,333.33, reflecting the amount of money that C.M. was paid by the Charity of the $70,000 salary before she quit the job. (D.E. 351, T. Goss Sent. Memo. p. 22.)

---

[1] While the Government in its original sentencing memorandum used the figure of $90,000, which was the initial bribe offer made to Senator Woods, for the purposes of this hearing, the Government will concede the figure to be $70,000, the amount which was finally offered for Senator Woods' fiancé to accept the job with the Charity.

The Court must choose the *greater* of either: (1) the bribes paid; or (2) the benefit received or (3) the loss to the Government. *See United States v. Richard*, 775 F.3d 287, 297 (5th Cir. 2014). Since, as argued below, the evidence supports that both defendants were aware of, or chose to be willfully blind to, the bribery schemes between the Charity and Senators Hutchinson and Woods and Representative Wilkins, in their totality, the Court must determine, based on the evidence, which loss is greatest and use that amount for its guideline calculations. The Government asserts that the greater loss between these choices to be the value of the benefit received, or expected to be received, which as calculated by the Government would be between $1,500,000 and $3,500,000, leading to a +16-level enhancement under U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(I).

### i. Estimated Value received from Bribes to Senator Hutchinson

The Government disagrees with B. Goss' $81,000 "estimate" as the amount of the bribe paid to Senator Hutchinson. (B. Goss Sent. Memo. 38.) The Charity paid Senator Hutchinson $379,000 during his employment at the Charity. B. Goss from the onset knew that Senator Hutchinson was a member of the Arkansas legislature. From the beginning, B. Goss and Cranford used Senator Hutchinson to influence, steer, and amend legislation helpful to the Charity. B. Goss dealt with Cranford and Senator Hutchinson in this way, during the same time that B. Goss, T. Goss, and Cranford were using Senator Woods to direct GIF funding to the Charity. The evidence supports that B. Goss either knew, or made herself willfully blind, that the sole purpose for hiring Senator Hutchinson was to use his influence in the Arkansas legislature, not for his legal ability. (Gov. Sent. Memo. pp. 18-30); *see United States v. Butler*, 646 F.3d at 1042. B. Goss knew, or had reason to know, that the payments to Senator Hutchinson, in totality, were to bribe him for his

legislative services, and the total amount paid, $379,500, not $81,000, is a more "reasonable estimate" of the bribe amount.

T. Goss objected to the inclusion of the bribes paid to Senator Hutchinson for the Charity in his relevant conduct. (T. Goss Sent. Memo. p. 23.) At the time B. Goss and Cranford "hired" Senator Hutchinson to work for the Charity, T. Goss himself had participated with Cranford in the bribing of Senator Woods and Representative Wilkins. T. Goss provided direction to Senator Hutchinson to the Criminal Justice Reform bill to benefit the Charity. (Gov. Sent. Memo. p. 24.) T. Goss knew, or was willfully blind to the fact, that from its inception Senator Hutchinson's hiring and regular payments from the Charity were bribes for Senator Hutchinson to do the bidding of the Charity in the Arkansas legislature. The $379,500 in bribe payments to Senator Hutchinson are, therefore, also attributable to T. Goss.

Because B. Goss and T. Goss were on notice that Cranford was bribing Senator Hutchinson, both are liable under U.S.S.G. § 2C1.1(b)(2) for the value of anything obtained from Senator Hutchinson's actions because of the bribes. Senator Hutchinson's own admissions in his Plea Agreement states that one of the official actions he took, in exchange for the bribes, was to "promote the Charity's . . . position on the ADHS Initiatives, including Episodes of Care, in the Arkansas legislature[.]" (Exhibit 14; D.E. 58, J. Hutchinson Plea Agreement, p. 5.) The value of this work, as represented by T. and B. Goss themselves to the Charity's Board of Directors ("BOD") when justifying Cranford's value to the Charity, was stated at $1,867,552.17. (D.E. 343, Gov. Sent. Memo. p. 38.) Both defendants attack the Government's original sentencing memorandum's discussion of the profitability of the defendant's Episode of Care Scheme as well as attacking the Government's analysis that the defendants received profit from the third-party transactions between the Charity and the defendants' third-party for-profit company. (B. Goss

-6-

Sent. Memo. pp. 25-34; T. Goss Sent. Memo. pp. 39-58.)  As articulated in the Government's original sentencing memorandum and below, there is more than a preponderance of evidence to support the Government's analysis on these issues.

On or about January 18, 2015, at the request of the defendants, T.W., the Charity's in-house accountant prepared and presented the below document titled "Evaluation of Impact of Cranford Coalition Expenses" which T.W. described as a "conservative" analysis and which stated, in part, "[y]es, the expenses were large; but the opportunity cost of not engaging the coalition's services appear to be far more costly."  T. Goss assisted in the preparation of this document.  (Exhibit 1260.)  T.W.'s analysis, in part, is below (Exhibit 803):

**Alternative Opportunities, Inc.**
**Evaluation of Impact of Cranford Coalition Expenses**
**2013/2014/2015**

Summary of Financial Impact:

| Achievement | 1 Year Revenue Impact | 1 Year Impact Cash Flow | Annual Revenue Impact Going Forward | Annual CF Impact Going Forward |
|---|---|---|---|---|
| Episodes of Care | $ 5,090,013.03 | $ 622,517.39 | $ 5,090,013.03 | $ 622,517.39 |
| RSPMI Moratorium | 4,972,942.73 | 608,199.49 | 4,972,942.73 | 608,199.49 |
| Telemedicine | - | 291,462.00 | - | 291,462.00 |
| General Improvement Funds | 1,568,174.93 | 1,568,174.93 | | |
| HRA Merger | 22,500,000.00 | 1,795,766.00 | 22,500,000.00 | 1,795,766.00 |
| **Estimate Financial Impact of Cranford Coalition Services** | **$ 34,131,130.68** | **$ 4,886,119.82** | **$ 32,562,955.75** | **$ 3,317,944.89** |

This analysis was done to justify the money being paid to Cranford at the February 19, 2015, Charity BOD meeting (Exhibit 3089).  Neither the minutes from this meeting nor the emails presented in the Government's sentencing memorandum, make mention of the defendants' disagreement with T.W. or advising the BOD that the "creditability is virtually non-existent" for the calculation.  In fact, in an email on January 29, 2015, in response to T.W.'s analysis, defendant B. Goss wrote to T.W. that the "financial impact to [the Charity] had [Cranford] and [defendant Tom Goss] not been successful is beyond words." (Exhibit 1259.)  For his part, in response to defendant B. Goss, defendant T. Goss described the value of the Hutchinson bribes, as follows: "Killed everything annually from moratorium (RSMPI) to episodes [of Care]." (Exhibit 1260.)

-7-

The Charity admitted in the Non-Prosecution Agreement (NPA) (Exhibit 4002) that based on T.W.'s "conservative" analysis, the bribery scheme conducted by the Charity and the defendants resulted in at least a cost savings in the amount of $9,953,834.67 to the Charity from 2013 to 2017 (not including the one-time GIF monies). (Exhibit 4002, p. 23, ¶ 24.) The Charity further admitted that but for the illegal activity conducted by the Charity, and the defendants, the Charity would not have had an additional $11,076,399.60 in its coffers. (Exhibit 4002, p. 5, ¶ 5.)

The Charity in the NPA agreed to a forfeiture of $6,953,834.67 to the government and restitution of $1,122,564.93 to the State of Arkansas. (Exhibit 4002, p. 5, ¶ 5.) The forfeiture from the Charity was reduced by $3 million, half of the Charity's estimated legal expenses related to the investigation. The Episodes of Care was 18.7621% of the entire $9,953,834.67 of Charity's admitted cost savings. While the entire amount related to Episodes of Care, or $1,867,552.17, should be included for the loss calculation, only the remaining $562,864.13 not paid by the Charity (18.7621% of the $3 million reduction) should be included in forfeiture owed by the defendants.

Both defendants attempt to downgrade this estimate, asserting it was improperly derived by T.W. Yet T.W. created the estimate based upon both defendants' representations to him of Cranford's tremendous value to the Charity. Both defendants, in January of 2015, relied on this $1,867.552.17 estimate to justify Cranford's benefit to the Charity's BOD six months before B. Goss claims to have "discovered" the bribes to Hutchinson. It is convenient for the defendants to rely on this estimate when it suits their purposes, and then to attempt to discredit it when it does not. It is entirely appropriate to credit the $1,867,552.17 as a reasonable estimate of relevant conduct under U.S.S.G. § 2B1.1, as it is the defendants' "own estimate" of the value of the Senator Hutchinson bribe to the Charity. *See United States v. Edwards*, 496 F.3d 677, 684 (D.C. Cir. 2007). Moreover, should the Court agree, this analysis by itself puts the defendants' loss

calculation between $1,500,000 and $3,500,000, which leads to a 16-level enhancement under U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(I).

### ii. Estimated Value received from Bribes to Senator Woods and Representative Wilkins

The Government agrees with T. Goss that he should be held accountable for the $30,000 paid to Representative Wilkins. T. Goss should also be accountable for the full bribe offered to Woods, which was a $70,000 job provided to his fiancé, C.M., instead of the approximately $23,333.33 paid to C.M. for her actual work for the Charity. Because the $70,000 bribe was "an offer" or agreement to give Senator Woods as a *quid pro quo* to provide the $1,000,000 GIF to the Charity, this is the appropriate relevant conduct figure, even if, in the end, the bribe was not fully paid or consummated. *See* 18 U.S.C. § 666(a)(2) ("corruptly gives, *offers,* or agrees to give" anything of value to any person)(emphasis added); *see also United States v. Sabri*, 326 F.3d 937, 944 (8th Cir. 2003), *aff'd and remanded*, 541 U.S. 600 (2004) ("the legislative history reveals that § 666 was drafted and enacted to "extend federal bribery prohibitions to *bribes offered* to state and local officials . . . ." (emphasis added)); *see also United States v. Hernandez*, 731 F.2d 1147, 1149 (5th Cir. 1984) (in interpreting language in 18 U.S.C. § 201(b)(1) identical to § 666 found that "Section 201 requires only that something of value be offered or promised, not that a bribe actually be paid.")

B. Goss should also be held accountable for her actual knowledge, or willful blindness, regarding the bribes paid to Senator Woods and Representative Wilkins as already discussed above. B. Goss' email communications during this time show she was aware of the GIF scheme and helped direct C.M. to be hired by the company. (Gov. Sent. Memo. pp. 31-32.) T. Goss admitted in his plea agreement that this hiring was a quid pro quo to Senator Woods for his support of the $1,000,000 GIF. (D.E. 284, T. Goss Plea Agreement, p. 4.). Further, the evidence proffered

-9-

by the Government establishes that B. Goss knew, or at a minimum, was willfully blind to—*see United States v. Butler*, 646 F.3d at 1042—the bribes made to Representative, later Senator, Wilkins. (*See* Exhibit 2155, an email thread where Cranford in the context of influencing legislation before the Arkansas General Assembly, discusses visiting then Senator Wilkins' church where Wilkins was a minister. B. Goss informed Cranford to "do whatever it takes" and Cranford replied he was "passing the hat for collections.")

Both defendants should be held accountable for the $122,564.93 GIF provided to the Charity as a direct result of the bribe to Representative Wilkins and the $1,000,000 GIF provided to the Charity as a direct result of the bribe to Senator Woods since these amounts are the value of the benefits received by the Charity because of the bribes to Representative Wilkins and Senator Woods. (Gov. Sent. Memo. p. 35.) T. Goss asserts that the direct value of the benefit to the Charity, a non-profit, was zero, since the Charity spent the $1,122,564.93, exactly as required by the state of Arkansas in awarding the GIF grant. (*See* T. Goss Sent. Memo. p. 33.) The Government disagrees.

First, the $1,122,564.93 GIF grants would not have been provided to the Charity by the state of Arkansas but for the bribes to Senator Woods and Representative Wilkins, thus making that money unavailable to other organizations seeking to obtain that GIF funding. *See United States v. Landers*, 68 F.3d 882, 885 (5th Cir. 1995) ("[t]he harm caused by a bribe is the value lost to a competing party had the bribe not been paid.")

Second, the use of the GIF grant money by the Charity accrued direct benefit and value to the Charity. The Charity's non-profit status does not obviate the value of the GIF; in fact, the non-profit status of the Charity establishes the value of the GIF money obtained because of the bribes. The whole purpose of the Charity was to obtain funds from state and federal governments and to

-10-

administer and disperse those funds pursuant to their charitable obligations. Thus, while the Charity may not have made a "profit" from the GIF disbursements, they were clearly of value to the Charity because they facilitated and fulfilled the mission of the Charity, which was why these GIFs were sought after in the first place. *See United States v. Sapoznik*, 161 F.3d 1117, 1118–19 (7th Cir. 1998) ("To show that the bribes benefited the people paying them-here the operators of gambling dens and their gangster backers-it is enough for the government to show that the bribes facilitated the gambling operations"). The Charity in its NPA with the Government agreed that the $1,122,564.93 in GIF money was a benefit or value to the Charity and agreed to repay that full amount to the state of Arkansas as part of the NPA. (Exhibit 4002, p. 5, ¶ 5.)

Third, the awarding of the GIF also freed the Charity to spend an equal amount of funds on other purposes not a part of the Charity's purpose, such as the kickback scheme between T. Goss and Cranford, which T. Goss tacitly admits to in his plea agreement. (D.E. 284, T. Goss Plea Agreement, p. 4.) T. Goss caused the Charity to issue checks to Cranford, via the Cranford Coalition, totaling $735,875. In turn, Cranford kicked back approximately 50 percent, or $356,350, to the defendants by issuing checks from the Cranford Coalition to defendant T. Goss. These payments to Cranford and the kickbacks to the defendants occurred during the time of the bribes by Cranford to Senators Woods and Hutchinson, and Representative Wilkins. For example, on December 12, 2013, the Charity received and deposited the $1,000,000 GIF funds they received from bribing Senator Woods (Exhibit 1729). On December 12, 2013, the Charity issued check #91508 in the amount of $187,175 to the Cranford Coalition. A portion of this check, $17,175, was payment for the Charity's rental of Cranford's Florida house. Further, on December 12, 2013, Cranford issued a check to T. Goss in the amount of $85,000, exactly half of the remaining $170,000 funds. (Exhibit 855). Cranford and T. Goss were already paid directly by the Charity

and did not conduct any additional contract work in exchange for this payment. This payment to Cranford and the kickback to T. Goss was tied directly to the GIF funds procured by bribing Senator Woods and provide context to the celebratory emails sent between T. Goss, B. Goss, and Cranford, on December 2, 2013; Cranford's "Santa is coming" and "I need Santa;" T. Goss' email "Me too my brother;" and Cranford's email to B. Goss "It's done darlin. Money on way[.]" (*See* Gov. Sent. Memo. p. 33.) For these reasons, the $1,122,564.93 in GIF money was a benefit or value to the Charity and should be included as part of the relevant conduct analysis under U.S.S.G. § 2B1.1.

### iii.  The Bribes to Hutchinson, Woods and Wilkins, and the Direct Value of those Bribes Supports a Relevant Conduct Determination under U.S.S.G. § 2B1.1(b)(1)(I) of 16

Based on the above evidence, the correct total relevant conduct amount is approximately $2.9 million[2]:

| SCHEME | Method | VALUE/LOSS |
|---|---|---|
| GIF obtained from Wilkins | Net Value of Benefit | $ 122,564.93 |
| GIF obtained from Woods | Net Value of Benefit | $1,000,000.00 |
| Episodes of Care (Hutchinson) | Estimated Net Value of Benefit | $1,867,552.17 |
| Total | | $2,990,117.10 |

Using this total, under U.S.S.G. § 2B1.1(b)(1)(I), the offense level would increase 16 levels because the bribes paid, and benefits received, are between $1,500,000 and $3,500,000.

---

[2] The Government does not include in this calculation the Cranford/Goss kickback scheme, already discussed. The kickback scheme was an extension of the bribery scheme, but the Government also recognizes that funds obtained by the Charity from the $1,122,556.93 GIFs may have been used, in part, to help pay out the kickbacks. Thus, to avoid double counting, these figures are not included here. However, for the reasons suggested later in this memo, the Government would contend that the full $735,875 be considered for forfeiture or restitution purposes.

### c. +4 Level Enhancement under U.S.S.G. § 2C1.1(b)(3)

Neither defendant challenges that the offense involved an elected public official or any public official in a high-level decision making or sensitive position. Therefore, a +4-level enhancement is applied pursuant to U.S.S.G. § 2C1.1(b)(3).

### 3. +4 Level Enhancement for an Aggravating Role as an Organizer or Leader of a Criminal Activity Involving Five or More Participants or was Otherwise Extensive under U.S.S.G. § 3B1.1(a) is Applicable to both Defendants

The PSRs for both defendants applied this enhancement and both defendants objected to its application. (B. Goss PSR, ¶ 85; T. Goss PSR, ¶ 86.) The Government dealt extensively with this issue in its original sentencing memorandum, and nothing the defendants argued in their sentencing memorandums refutes the Government arguments and the PSRs. (Gov. Sent. Memo. pp. 36-44.) The core of the defendants' arguments are that they were both duped and controlled by their co-conspirator Cranford, who purportedly took advantage of T. Goss' grief and mental state over the loss of his son, and B. Goss' "loyalty," to direct and control the bribery scheme to Senators Woods and Hutchinson and Representative Wilkins. (B. Goss Sent. Memo. p. 25; T. Goss Sent. Memo. p. 14.)

These claims are not credible in the face of the evidence in this case and should be rejected by this Court. The email communications between the defendants and Cranford alone show that it was the defendants who continued to employ Cranford, controlled the extent of his operations, provided direction to him in his communications with the public officials that the Charity bribed, provided the resources and funds to bribe these officials, and protected Cranford when the Charity's outside counsel, Jeff Morris, sought to interview him and suggested his termination, when Cranford refused. Indeed, B. Goss ridiculed the extent of Cranford's independence from her

-13-

control, stating that she was the "COO" of the Charity and that Cranford "does not decide the direction, (of the Charity) nor approve it." (Exhibit 1263.)

B. Goss's assertion that her meeting with Cranford in a Little Rock hotel in July of 2014, where Cranford notified B. Goss of the FBI's investigation that he had paid bribes to Senator Woods, somehow shows her lack of knowledge and control over Cranford's activities is specious at best. B. Goss, for effect, states that she told Cranford that if he had any information about bribing Senator Woods, he should tell the FBI "everything." (B. Goss Sent. Memo. pp. 1; 21-22.) Why would B. Goss do this, her attorneys rhetorically ask, if she already knew about the bribery? The answer, consistent with the overwhelming evidence in this case, is simple: Bontiea Goss was trying to cover her tracks. Indeed, as the evidence shows, Bontiea Goss was not only aware of the schemes to pay bribes to Senators Hutchinson and Woods, she led the way in the hiring of Hutchinson and Woods's fiancé, C.M. When Cranford approached Bontiea Goss during the Little Rock hotel meeting in July 2014 *and made her aware of the fact the FBI was investigating this matter,* Bontiea Goss saw the writing on the wall and tried to distance herself from her criminality by telling Cranford to cooperate with the FBI. Most tellingly—and to ask Defendant's question differently—why did B. Goss not report her role in the payments to C.M, (i.e., the bribe to Senator Woods) to the FBI or to the Berkowitz and Oliver attorneys representing the Charity, or even to the Charity's BOD, after the hotel meeting? And why, after she claimed she was aware of the bribe payments by Cranford to Hutchinson and Senator Woods, did she refuse to terminate Cranford, allow him to stonewall the Berkowitz and Oliver attorneys, and advocate for the BOD of the Charity to enter a new, and more lucrative, consulting agreement with Cranford after he finally did leave the Charity's employment?

-14-

We know the answers to these questions. B. Goss told Jeff Morris she would not terminate Cranford because of his refusal to cooperate in the investigation, because Cranford was "too important" for the Charity and "without Rusty we don't have Arkansas." (Gov. Sent. Memo. p. 49.) While B. Goss suggests that her "loyalty was admirable at the time" (B. Goss Sent. Memo. p. 25) the real reason for B. Goss' protection of Cranford was self-preservation, not loyalty.

Similarly, T. Goss's attempts to minimize his role in the conspiracy is also not credible. He directed the Charity's payment to Cranford of $735,875, in part so that T. Goss could receive his kickback of $356,350. The emails between T. Goss and Cranford—some of which reference "Santa is coming" and "I need Santa" in reference to the kickbacks—do not reflect a man blinded with grief, but instead a person in total control of his senses celebrating the windfall to the Charity of the GIF money and the anticipated payouts to Cranford and kickbacks to T. Goss. Cranford's actions could not have happened but for the support, control, and direction of both defendants.

The 4-level enhancement is properly applied to both defendants, and the defendants' objections should be denied. *See United States v. Dijan*, 37 F.3d 398, 403 (8th Cir. 1994) (The sentencing judge appropriately assessed the U.S.S.G. § 3B1.1(a) +4 level organizer or leader enhancement where "[t]he decision to go ahead with the bribes rested" with the defendants.).

**4. The Total Offense Level for Count 1 after Acceptance of Responsibility for both Defendants Should be at Least a Level 35, with an Advisory Guideline Range of 168 to 210 months**

**a. Government's Calculations**

Based on the above calculations, the Government submits the following Guideline calculations are applicable in both defendants' cases using the benefit to the defendants, vis-à-vis the Charity, analysis:[3]

---

[3] As already articulated in the Government's original sentencing memorandum, the Government asserts that acceptance of responsibility under U.S.S.G. § 3E1.1 should be awarded to both

| Applicable Guideline | Level |
|---|---|
| U.S.S.G. § 2C1.1(a)(1) | +12 |
| U.S.S.G. § 2C1.1(b)(1) | +2 |
| U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(I) | +16 |
| U.S.S.G. § 2C1.1(b)(3) | +4 |
| U.S.S.G. § 3B1.1(a) | +4 |
| Total before Acceptance of Responsibility Reduction | +38 |
| U.S.S.G. § 3E1.1 (Acceptance of Responsibility) | -3 |
| Total | 35 |
| Advisory Guideline Range (Criminal History I) | 168-210 months |

While the government submits the above calculations are the correct ones, the United States notes that even using a straightforward calculation of the amounts of the bribes paid, rather than the benefit received analysis, pursuant to U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(G), the Guidelines calculations, listed below, would nevertheless be greater than the defendants' overall statutory exposure:[4]

| Applicable Guideline | Level |
|---|---|
| U.S.S.G. § 2C1.1(a)(1) | +12 |
| U.S.S.G. § 2C1.1(b)(1) | +2 |
| U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(G) | +12 |
| U.S.S.G. § 2C1.1(b)(3) | +4 |
| U.S.S.G. § 3B1.1(a) | +4 |
| Total before Acceptance of Responsibility Reduction | +34 |
| U.S.S.G. § 3E1.1 (Acceptance of Responsibility) | -3 |
| Total | 31 |
| Advisory Guideline Range (Criminal History I) | 108-135 months |

Putting aside questions of the value of the legislation B. Goss and T. Goss procured through bribery, the evidence is irrefutable that B. Goss and T. Goss conspired with Cranford to pay Jeremy Hutchinson $379,000 in bribes masked as purported legal fees in exchange for his official action.

_____

defendants because of their guilty pleas, avoiding the estimated 2 ½ month trial. Also pursuant to the plea agreements, the Government is not seeking, or arguing for, a 2-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

[4] This amount totals $479,500 and includes the bribes paid to Senator Hutchinson ($379,500), Senator Woods ($70,000) and Representative Wilkins ($30,000). Because this amount is more than $250,000 but less than $550,000, it falls under U.S.S.G. § 2B1.1(b)(1)(G), which increases the offense level by 12.

-16-

Additionally, the defendants, in conspiracy with Cranford, paid Senator Woods and Representative Wilkins $100,000 in bribes in exchange for official actions. Specifically, as executives of the Charity who directed and funded Cranford's bribe payments, each played a role in the $70,000 job that was *offered* to Woods's wife—regardless of whether she stayed on permanently—in exchange for official action and the $30,000 paid to Representative Wilkins. *See* 18 U.S.C. § 666(a)(2) ("corruptly gives, *offers,* or agrees to give" anything of value to any person) (emphasis added); *see also Sabri*, 326 F.3d at 944 ("the legislative history reveals that § 666 was drafted and enacted to "extend federal bribery prohibitions to *bribes offered* to state and local officials . . . ." (emphasis added)). For the reasons stated in the government original sentencing memorandum, and again above, B. Goss's and T. Goss's attempts to minimize their role and the number and amount of bribes they caused to be paid are not credible in the face of the evidence and should be rejected by this Court.

## C. Defendants' Third-Party Transactions with the Charity Acted to Embezzle Government Funds from the Charity and can be Considered by the Court in Sentencing

Both defendants attack the Government's proof concerning the defendants' third-party transactions with the Charity, which acted to embezzle funds from the Charity. The Government has provided sufficient evidence to the Court that the defendants engaged in third party transactions and other schemes to illegally take funds from the Charity, which refutes both defendants' arguments that their motives were not based on financial gain but instead were for the "good" of the Charity and "altruistic." It is entirely appropriate for the Court to consider these illegal acts by the defendants in its determination of an appropriate sentence and for restitution and forfeiture since the defendants' bribery of public officials is intertwined with these third-party transactions as alleged in the conspiracy count of the Indictment to which the defendants both pled

-17-

guilty. (D.E. 65, ¶ 72); (*see also* D.E. 282 B. Goss Plea Agreement, ¶ 4; D.E. 284, T. Goss Plea Agreement, ¶ 4) ("[t]he defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the Indictment, as well as all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to § 1B1.3(a)(2) in calculating the offense level for the charges to which [the defendant] is pleading guilty.")

### 1. The Rental Car Scheme

This scheme was described in detail in the Government's original sentencing memorandum. (Gov. Sent. Memo. pp. 51-55.) The defendants in their sentencing memorandums and through their expert witnesses allege that in 2006 the Charity was unable to secure credit from lenders for commercial loans with which to purchase real property and assets, including a contract with Enterprise Car Leasing (Enterprise). (T. Goss Sent. Memo. 40.) However, as stated in SA Effland's second affidavit filed with this reply sentencing memorandum, C.S., the Fleet Manager for Enterprise, stated that the Charity, with approximately $56 million a year in revenue, $2.5 million in assets, and a record of paying $400,000 per year in vehicle leases would have certainly been approved for a lease like the one Enterprise entered in with WDAH. These figures are reflective of the revenue and assets reported on the Charity's Form 990 for the fiscal year ending June 30, 2008. (Exhibit TG-86.) C.S. also stated he could not think of a legitimate business reason why a company of the Charity's size would have needed a third party to facilitate the lease agreements with Enterprise. (Effland Supp. Aff., Attachment C, ¶ 9.) Regardless of defendant T. Goss' expert Steve Browne's assertion in his affidavit, had the Charity rented the vehicles from Enterprise directly instead of using WDAH as the middleman, the Charity, and by extension the Federal Government, would have saved $1,132,424.55 in the years 2010 through 2014 as shown below (Exhibit 303):



By having the Charity rent the cars from WDAH at a price above fair market value, the defendants caused excess benefit transactions that should have been reported on the Charity's Forms 990. (*See* Sellner Aff. Attachment D, ¶ 17; *see also* Ellis Aff. Attachment E, ¶ 3.)

## 2. The Lake House and Mountain House Scheme

This scheme was described in the Government's original sentencing memorandum. (Gov. Sent. Memo. pp. 55-62.) The defendants purchased and then later transferred the "Lake House" and "Mountain House" from their personal names into the name of WDAH. As T. Goss explained to a banker on August 28, 2009:

> Bontiea and I desperately want to buy a lake house just outside of Eureka Springs on Beaver Lake. It was listed for $1,999,999 at one time. We have an offer on it turnkey for $898,000. *It is the most beautiful house we have ever been in and want to retire here in the future.* Until then we will use it about 10 days a month and let the executive management utilize the home the rest of the month for which [the Charity] will be charged a fee, passed through [WDAH]… One additional significant asset not listed is we can get a [long term] lease from [the Charity] for the amount of the payment or close.

(Exhibit 405) (emphasis added). B. Goss was copied on this email. The defendants buying the "Lake House" and then renting it to the Charity was not a benefit to the Charity, it was simply the defendants devising a way for the Charity to pay for the mortgage on their potential retirement home.

The defendants, by structuring the property as a "rental property," were able to deduct the costs associated with the properties. For example, WDAH deducted the depreciation, mortgage interest, property taxes, utilities, Internet, and cleaning expenses. Regular taxpayers are not allowed to deduct expenses related to their traditional second or vacation homes, but because the defendants "rented" these properties to the Charity they were allowed to deduct the expenses on the partnership returns (*See* Ellis Aff., Attachment E, ¶¶ 12-13.)

Below is an example of the expenses, which T. Goss listed on WDAH's 2012 Form 1065, Partnership Tax Return, (Exhibit TG-134), related to the "Lake" and "Mountain" houses:

| | |
|---|---|
| Auto & Travel | $   6,000.00 |
| Insurance | $      702.00 |
| Legal & Other Professional Fees | $  31,468.00 |
| Interest | $  87,521.00 |
| Repairs | $  44,337.00 |
| Taxes | $    9,399.00 |
| Utilities | $  15,161.00 |
| Depreciation | $  62,972.00 |
| Miscellaneous | $    5,821.00 |
| Telephone | $  10,218.00 |
| Supplies | $  44,490.00 |
| | |
| Total | $ 318,089.00 |

The defendants were thus able to use the "Lake House" and "Mountain House" for their personal use and for the personal use of family and friends, and they were able to deduct all the expenses associated with the homes, which reduced their personal tax liability, all while the Charity paid the mortgage and built equity in the properties. The defendants saved approximately $265,000 in personal income tax liability for the years 2006 through 2015 by reporting their portion of the losses associated with WDAH (See Ellis Aff., Attachment E, ¶ 13.)

-20-

The defendants, and their experts, assert that the defendants sold the "Lake" and "Mountain" houses for prices below fair market value and argue that the entire transaction was for the Charity's benefit. This argument wholly disregards that the defendants refinanced and withdrew the equity of the "Mountain House," built up by the payments the Charity made on both properties, shortly before their sale. However, when T.W., not knowing about the refinance, told the BOD the defendants were willing to sell the property at "current loan value" it told a different story than if the defendants had informed either T.W. or the BOD that the defendants were receiving substantial cash from the sale. Additionally, the defendants allowed the BOD to purchase the properties not aware of their minimal use by the Charity and when T.W. believed the Charity should not have purchased the properties. Instead, the defendants instructed T.W. to present the properties in a matter to ensure the Charity's BOD approved the purchase, to their benefit, and do so quickly. (Effland Aff., Attachment A, ¶¶ 9-10.)]

### 3. The Charity loaned funds to the Defendants' various for-profit companies.

While the defendants allege that the Charity did not have the funds or credit available to secure financing, during this time frame, the Charity evidently had the funds to "loan" significant amount of money to the defendants' for-profit companies, as shown in the table below (Exhibit 233).

| Tax Year | Year End Date | Due to Charity at Year End From: | | | Total | Interest Paid |
|---|---|---|---|---|---|---|
| | | WDP | WDAH | NWARPMG | | |
| 2007 | 6/30/2008 | $0.00 | $123,358.43 | $0.00 | $123,358.43 | $0.00 |
| 2008 | 6/30/2009 | $0.00 | $158,073.43 | $95,282.50 | $253,355.93 | $0.00 |
| 2009 | 6/30/2010 | $124,000.00 | $368,769.43 | $162,282.50 | $655,051.93 | $0.00 |
| 2010 | 6/30/2011 | $123,395.40 | $599,352.09 | $489,247.96 | $1,211,995.45 | $0.00 |
| 2011 | 6/30/2012 | $123,395.40 | $581,352.09 | $501,786.87 | $1,206,534.36 | $0.00 |
| 2012 | 6/30/2013 | $123,395.40 | $581,352.09 | $514,983.68 | $1,219,731.17 | $0.00 |
| 2013 | 6/30/2014 | $30,000.00 | $509,820.00 | $533,277.77 | $1,073,097.77 | $0.00 |
| 2014 | 1/30/2015* | $0.00 | $200,000.00 | $202,000.00 | $402,000.00 | $21,173.32 |
| * Loans were paid off prior to merger with PFH | | | | | | Source: EX 0325 |

David Hayes, in an interview on June 13, 2017, stated that Northwest Arkansas Property Management Group LLC was set up to buy a modular building in Arkansas. According to Hayes, this for-profit LLC borrowed the downpayment from the Charity and then financed the remaining balance through a company specializing in modular businesses. Hayes explained that the Charity paid monthly rents to cover the monthly payments so there was little to no risk involved for the LLC. In addition, the LLC owners, including the defendants received large annual depreciation deductions, which lowered their individual income tax liabilities. (Effland Supp. Aff., Attachment C, ¶ 8.) Hayes stated that all the real estate purchases done through the for-profit LLC's were "safe" because the Charity would make the payments through the rents and at the end of the loans the LLC's would own the assets. (Effland Supp. Aff., Attachment C, ¶ 8.)

### 4. Alleged Tax Losses do not Mean that the Defendants did not Benefit from the Charity's Relationship with their For-Profit Companies.

The defendants' experts focus on the "losses" the defendants' for-profit LLCs reported on their partnership tax returns; however, the losses for tax purposes does not show the actual cash flow or the other benefits the defendants received by WDAH renting the properties to the Charity. In addition to the benefits of owning (through WDAH) the retirement/vacation homes, having these properties available to them and their family, and in spite of the reported losses claimed on the for-profit LLCs tax returns, T. Goss, B. Goss, and their codefendants Marilyn Nolan and Keith Noble[5] received a net $1,165,170.51 from WDAH and White Dog Properties (WDP) for the years 2013 through 2017 as displayed below: (Exhibit 238; Effland Aff., Attachment C, ¶ 5.)

---

[5] Both Nolan and Noble have pled guilty to their involvement in these schemes.



Net Transfers from WDAH and WDP
2013-2017

Tom and Bontiea Goss
$460,028.35

Keith Noble
$348,570.55

Marilyn Nolan
$356,571.61

Additionally, there is no evidence that the defendants ever reported to their bankers they were losing money on their ownership of WDAH. In fact, in December 2014, the codefendants refinanced real estate with Wood & Huston Bank. During the loan review process, the loan officer made these observations about WDAH (Exhibit 3238, p. 172):

- *The property was used by the Charity Executives;*
- *Total combined rent (from the Charity) for the Lake House and Mountain Home was $180,000 annually;*
- *The Charity leases vehicles from WDAH. The lease expense paid by WDAH is $245,200 annually compared to the lease rate paid by the Charity of $570,000, so the net profit from this activity contributed to the WDAH tax return in 2013 was $231,800.*

It is thus appropriate for the Court to consider the benefits the defendants received from these transactions, in fashioning a reasonable sentence and the ordering of restitution and forfeiture in these cases.[6]

---

[6] Additionally, the Defendants also attack the evidence presented in the Government's original sentencing memorandum that the defendants enriched themselves in improperly using private charter flights paid for by the Charity for their personal use (Gov. Sent. Memo. 63-66); leveraged their relationship with the Charity to assist their for-profit business PRO1 (Gov. Sent. Memo. 66-70); and failed to disclose the David Hayes embezzlement. (Gov. Sent. Memo pp. 70-73.) The Charter Flight scheme, the PRO1 scheme and the Hayes embezzlement were alleged in the conspiracy count of the indictment. (Doc. 65, ¶ 72(c) (PRO1 scheme); ¶ 72(g) (Charter Flight scheme); ¶ 75(d) (Hayes Embezzlement). The Government continues to stand by this evidence and argument and asks the Court to consider it in fashioning its sentence and restitution and forfeiture orders.

-23-

**D.  Both Defendants Should Pay Fines for their Crimes.**

Both defendants are capable of paying fines for their crimes.  B. Goss states she is willing to pay a fine of $250,000, as requested by the Government in its original sentencing memorandum. (B. Goss Sent. Memo. p. 1.)   T. Goss does not discuss the fine amount in his sentencing memorandum, but the Government continues to request that the Court order T. Goss to pay a total fine amount of $350,000.

**E.  The Defendants should Pay either Restitution or Forfeiture or a Combination in their Cases.**

The plea agreements for both defendants contemplate the possibility of this Court ordering restitution or criminal forfeiture or both.  Under the terms of each plea agreement, the defendants "agree[d] to the entry of a forfeiture money judgment and/or restitution against [them] in an amount of no less than zero dollars and no more than $4,350,000," to be shared among them. (B. Goss Plea Agreement, Doc. 282, p. 13, ¶ 18(b); T. Goss plea agreement, Doc. 284, p. 14, ¶ 18(b).) Further, the defendants' plea agreements provide that "[t]he court <u>must</u> order restitution to the victims of the offense to which the defendant is pleading guilty." ((D.E. 282, B. Goss Plea Agreement, p. 13, ¶ 18(a); D.E. 294, T. Goss plea agreement, p. 14, ¶ 18(a)(emphasis added.) Both defendants now argue that the Government should be limited solely to criminal forfeiture, that the Government was not a victim under the MVRA, this Court should not order restitution, and that the forfeiture should be limited solely to the defendants' proceeds of their offenses.  (B. Goss Sent. Memo. p. 41-42; T. Goss Sent. Memo. p. 63-65.)  The Government disagrees and asserts that it is entitled to both restitution and/or forfeiture as seen appropriate by the Court.

Restitution and forfeiture are mandatory. 18 U.S.C. § 3663A(a)(3) and 28 U.S.C. § 2461(c). "Criminal forfeiture and restitution are separate remedies with different purposes." *United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010). "Restitution exists to make

victims whole. Forfeiture, on the other hand, exists to punish those who commit crimes." *United States v. Channon*, 973 F.3d 1105 (10th Cir. 2020). "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains." *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) (internal quotation marks omitted). By contrast, "the purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006).

B. Goss claims that the government is not entitled to restitution because it does not fit within the definition of a "victim" under 18 U.S.C. § 3663A(a)(1). However, that is patently incorrect – the government can be a "victim" entitled to restitution, *United States v. Senty-Haugen*, 449 F.3d 862, 865 (8th Cir. 2006), but the award must be based on "the amount of loss actually caused by the defendant's offense." *United States v. Clausen*, 949 F.3d 1076, 1081 (8th Cir. 2020) (quoting *United States v. Petruk*, 484 F.3d 1035, 1036 (8th Cir. 2007)).

Both defendants further claim that the government sustained no loss because "every dollar [the Charity] received in federal grants went towards its proper and intended purpose[.] So it cannot prove that it was harmed." (B. Goss Sent. Memo p. 41; *see also* T. Goss Sent. Memo p. 64.) That is not correct, either, as just because the money was used for its intended purpose does not mean the government suffered no loss. For example, in *Petruk*, the defendants received subsidies from the Department of Housing and Urban Development (HUD) that they were not entitled to but used those subsidies for their intended purpose. The *Petruk* Court determined that for the purposes of restitution, the actual loss suffered by HUD was the subsidies paid minus the amount that would have been present absent fraud. *Petruk*, 484 F.3d at 1036. If this Court were to find that monies would have not been obtained, or would have been a lesser amount, had the defendant not

-25-

perpetrated a fraudulent scheme, then the difference between that amount and the amount obtained by the defendant would be the loss for restitution purposes. *Id*.

The Charity received much of its funding from federal and state sources. The defendants caused the Charity to expend money derived from federal and state sources to bribe public officials, and then received kickbacks from those funds. These illegal funds commingled with the Charity's other funds, and the defendants used their access to the Charity to pull out monies that they then used for their own use. Whether it is either to provide restitution to the Government for its lost funds that it would not have provided to the Charity through the defendants' illegal actions, or to forfeit the defendants' ill-gotten gains because of their criminal activity, the Court has the authority to provide both restitution and order forfeiture in this case.

### 1. The Court Should Order the Forfeiture of $562,864.13 as the Defendants' Share of the Charity's Gain from Episodes of Care scheme

As already discussed, the Charity estimated it profited $1,867,552.17 over a three-year period from the bribes paid to Senator Hutchinson on the Episodes of Care legislation. (Gov. Sent. Memo. pp. 20-23; 46; 73). Senator Hutchinson in his plea agreement acknowledged this was one of the legislative acts for which he was bribed by the defendants and Cranford. (Exhibit 14; D.E. 58, J. Hutchinson Plea Agreement, p. 5.) Also, in the Charity's NPA, it acknowledged this was the amount that the Charity benefited from the illegal act, and the Charity agreed to pay $1,304,688.04 of this amount. (Exhibit 4002, p. 5, ¶ 5.) These were illegal proceeds obtained by the Charity at the direction of the defendants and are thus a forfeitable asset for which the defendants should be obligated to pay the remaining $562,864.13.

### 2. The Court Should Order the Defendants to Pay in Restitution for the Cost of the Bribes Paid to Senators Hutchinson and Woods and Representative Wilkins, to the Extent not Already Paid by Other Codefendants

The defendants used proceeds of the Charity, federal money, to illegally bribe Senator Hutchinson, in the amount of $379,000; Senator Woods, in the amount of $70,000; and Representative Wilkins, in the amount of $30,000. To the extent not already paid by these codefendants, the defendants should be ordered to provide restitution to the Government of these amounts, since this was Government money used by the defendants for an illegal purpose.

### 3. The Court Should Order the Defendants to Pay in either Forfeiture or Restitution the Payments to Cranford and the Kickbacks to the Defendants

The defendants paid Cranford $735,875 with Charity funds—again derived from federal dollars—as part of the kickback scheme, by which Cranford kicked back $356,350 to the defendants. T. Goss acknowledges the kickback he received was $356,350. (T. Goss Sent. Memo. p. 38.) Thus, here it would be appropriate to order the restitution of $379,525 from the defendants to the extent not already paid by Cranford, as the use of Government money for an illegal purpose, and for the forfeiture of $356,350, as illegal proceeds obtained directly by the defendants.

### 4. The Court Should Order the Defendants to Pay in Forfeiture the Funds Received from the Third-Party Transactions involving WDAH

The defendants received from the Charity, through payments to WDAH, $1,132,424.55 for the Rental Car Scheme, payments of $306,472.81 for the sale of the "Mountain House," and payments of $570,850.00 for the rents paid by the Charity for the "Lake Home" and the "Mountain Home." These are illegal proceeds from the conspiracy which were embezzled from the Charity and are forfeitable from the defendants.

-27-

**5. The Court Should Order the Defendants to Pay in Forfeiture the Benefit Received from the Charter Flights Paid for by the Charity**

The defendants received from the Charity, paid for with federal money, the benefit of charter flights for their personal use from their home in Colorado to Springfield, Missouri. The net value of this benefit was $181,814.70 and are illegal proceeds from the conspiracy which were embezzled from the Charity forfeitable from the defendants.

**6. The Government's Total of Forfeiture and Restitution Sought against the Defendants**

Below is the Government's estimate of appropriate forfeiture and restitution to be ordered in this case.[7]

| SCHEME | Forfeiture | Restitution |
|---|---|---|
| Bribes to Jeremy Hutchinson | 0 | $379,500.00 |
| Bribe to Wilkins | 0 | $30,000.00 |
| Bribe to Woods | 0 | $70,000.00 |
| Episodes of Care (Hutchinson) | $562,864.13 | 0 |
| Kickback Scheme: Cranford to the Gosses | $356,350.00 | $379,525.00 |
| Rental Car Scheme | $1,132,424.55 | 0 |
| Sale of Mountain House | $306,472.81 | 0 |
| Rents for Vacation and Retirement Homes | $570,850.00 | 0 |
| Charter Flights | $181,814.70 | 0 |
| Concealment of Hayes Embezzlement | 0 | $2,011,388.37 |
| Total: | $3,110,776.19 | $2,870,413.37 |
| Total both Restitution and Forfeiture | $5,981,189.56 | |
| Plea Agreement Limit on Restitution and Forfeiture | $4,350,000.00 | |

---

[7] The Government understands this figure is different from the one proposed in its original sentencing memorandum, but the Government has made these changes to reflect the defendants' legitimate concerns about the difference between restitution and forfeiture and considering that Senator Hutchinson only admitted to the Episode of Care scheme, and not the RSPMI scheme which was included in the original memorandum. These changes also consider that the Charity has already paid in full restitution to the state of Arkansas for the GIF scheme ($1,122,564.93) and its share of the Episodes of Care scheme ($1,304,688.04) and PRO1's restitution payment of $1,057,617.47, which included the $132,500.00 of Charity payments for the warehouse rent.

**F.   Defendants' and Government's Variance Requests from the Advisory Guideline Range and Sentencing Arguments**

Both defendants suggest that they should receive a variance from whatever Guideline range is applicable.  (B. Goss Sent. Memo. p. 42; T. Goss Sent. Memo. p. 9.)[8]  The defendants' arguments are not persuasive and should be rejected by this Court.  On the contrary, depending on the final Guideline calculation determined by the Court, an upward variance is warranted for both defendants, specifically for the nature of their offense, proportionality, and their lack of remorse, to ensure a total sentence of 48 months for B. Goss and a total sentence of 96 months for T. Goss.  The defendants' arguments and the Government's reasons for an upward variance, if necessary, are taken in turn.

**1.   The Defendants' Argument for Variance or Sentencing Consideration**

**a.   The Defendants' Service to the Disadvantaged as Part of their Work with the Charity does not Support a Variance or Serious Sentencing Consideration**

Both defendants assert their work with the disadvantaged to obtain employment, primarily through their work at the Charity, supports a variance, or at the least, serious sentencing consideration.  (B. Goss Sent. Memo. pp. 43-46; T. Goss Sent. Memo. p. 13.)  While some of the defendants' works may be admirable, they do not provide an excuse to break the law and do not support a variance or any serious sentencing consideration.  B. Goss was the Chief Operating Officer of the Charity, and T. Goss was the Chief Financial Officer of the Charity which over a five-year span from 2011-16 received millions of dollars in federal taxpayer money.  The evidence presented to the Court in the form of emails, transcripts, and interview reports, reflect that both B. Goss and T. Goss were highly motivated, intelligent, and committed executives of the Charity, dedicated to furthering the scope and power of the Charity.  This hard work was highly profitable

---

[8] Alternatively, T. Goss requests a sentence at the low end of the applicable Guideline range.  (T. Goss. Sent. Memo. 9.)

to themselves.  The Charity's success translated into financial success for defendants, who in 2015, one year after obtaining approximately $2,990,117.10 in tax money and benefits from the bribes obtained from Senators Woods and Hutchinson and Representative Wilkins, received a total of $496,852 in salary, for B. Goss, and $484,343 in salary, for T. Goss, from the Charity. (Exhibit 2448.)  Collectively, the defendants received more than $5 million in salaries from the Charity from 2014 – 2017. (Exhibits 2447, 2448, 2449, 2450.)  This, of course, does not include the additional perks of the job, including charter flights to their home in Colorado, the free use of rental vehicles, the use of two vacation homes, and interest free loans.

There is nothing wrong with financial success, but it does suggest that the defendants' actions are not as "altruistic" as they portray.  While charitable or volunteer activities conceivably can serve as the basis for downward departure or variance, such departures or variances are warranted only where those activities are "truly exceptional in nature." *See United States v. Neil*, 903 F.2d 564, 565–66 (8th Cir.1990); *see also* U.S.S.G. § 5H1.11 ("civic, charitable, or public service; employment related contributions and record of prior good works; and similar prior good works are not ordinarily relevant in determining whether to departure is warranted.")  The defendants work in servicing the disadvantaged to find employment is not "truly exceptional in nature" because that was their job as part of the Charity, and the defendants were well compensated to do it.  As observed in *United States v. Haversat*, 22 F.3d 790, 795–96 (8th Cir. 1994) a departure or variance on this basis "is appropriate only where the "district court 'finds an atypical case, . . . where [the] conduct [in question] significantly differs from the norm,'" *Id.* (*quoting Neil*, 903 F.2d at 565).  The defendants' work in helping the disadvantaged was not "atypical;" it was part of their job with the Charity, and it does not support a variance or serious sentencing consideration.

**b.  The Defendants' Charitable Actions, Gifts, and Service to Family and Friends do not Support a Variance or Serious Sentencing Consideration**

Both defendants also point to numerous self-serving acts of charity, volunteer work and financial gifts to family, friends, and community members including, but not limited to, providing tennis shoes to needy individuals, financial help to individuals not part of the defendants' immediate family, providing funds for college, braces, cars, clothing, furniture, and purchasing computers for school libraries in Tibet and Costa Rica, to support a variance or serious sentencing consideration.  (B. Goss Sent. Memo.  pp. 47-53; T. Goss Sent. Memo. pp. 12-13.)  B. Goss, after her termination from the Charity, volunteered at other charitable organizations, such as the Red Cross, and working at food banks.  (B. Goss Sent. Memo. p. 47.)

"Villains who twirl their mustaches are easy to spot. Those who cloak themselves in good deeds are well-camouflaged."[9]  The defendants' charitable contributions and activities, while laudable, are not, considering the defendants' status and financial means, extraordinary, particularly when taken in the context of the crimes for which they have pled guilty.  *Haversat*, 22 F.3d at 796 ("It would appear that high-level business executives. . . also enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities.")  *See* U.S.S.G. § 5H1.10 (socio-economic status not relevant to determination of sentence).  As more fully explained in *United States v. Vrdolyak*, 593 F.3d 676, 682–83 (7th Cir. 2010):

> Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card. *United States v. Repking*, 467 F.3d 1091, 1095-96 (7th Cir. 2006) (per curiam); *United States v. Ali*, 508 F.3d 136, 149 (3d Cir. 2007); *United States v. Cooper*, 394 F.3d 172, 176-77 (3d Cir. 2005). As the court in *Repking* put it (quoting *Cooper*), "charitable works must be exceptional before they will support a more-lenient sentence, for ... 'it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives ... to find that a

_____

[9] *Star Trek, The Next Generation: The Drumhead*, (Syndicated television broadcast Apr. 29, 1991.)

-31-

defendant was involved as a leader in community charities, civic organizations, and church efforts.'" 467 F.3d at 1095. People "who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot." *United States v. Thurston*, 358 F.3d 51, 80 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1097, 125 S.Ct. 984, 160 L.Ed.2d 988 (2005); cf. *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). "To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being." *United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990).

By extension, the numerous character letters written on behalf of the defendants do not support a variance or serious sentencing consideration. The character letters simply suggest that "even honest folk may act like sinners, unless they've had their customary dinners." Berholt Brecht, The Threepenny Opera (1928). The defendants' charitable contributions, good deeds, and purported good character, are simply being used to camouflage their criminal acts, and are not so extraordinary to support a variance or serious sentencing consideration.

### c.  Defendant T. Goss' Grief for his Son's Death does not Support a Variance or Serious Sentencing Consideration

Defendant T. Goss also suggests that the death of his son in 2011, his grief and depression over his son's death, and use of psychotropic drugs to combat that depression, should be considered in his sentencing as a reason for his "aberrant" conduct. (T. Goss Sent. Memo at 14.) The evidence from emails, interviews, and investigative reports indicate that T. Goss was cogent and coherent and fully engaged in the criminal activity in this case. While the Court can certainly consider that T. Goss suffered depression before and during the commission of the crimes charged, under the Section 3553 sentencing factors, and the totality of defendant's conduct, it can also find that any request for a downward variance, or for any serious sentencing consideration, based on his depression is unwarranted. *United States v. McDaniels*, 19 F.4th 1065, 1067 (8th Cir. 2021)

-32-

("District courts are afforded 'wide latitude' to weigh the relevant sentencing factors in each case and assign some factors greater weight than others in determining an appropriate sentence.")

### d. Both the Defendants' Concerns about their Medical Care in the BOP do not Support a Downward Variance or Serious Sentencing Consideration

Both defendants assert that they have medical and mental health conditions that will make a lengthy prison sentence a substantial risk to their continued health. T. Goss asserts the "presence of a heart arrythmia, susceptibility to infection-coupled with an immunity to most antibiotics, long Covid, serious chronic back and foot related issues and a concern that Mr. Goss would not receive the timely care necessary if he were faced with a serious or life-threatening occurrence related to these conditions." (T. Goss Sent. Memo. p. 18.) B. Goss asserts that "her most significant health concern is retinal vein occlusion (RVO) in her right eye. RVO is a serious condition, requiring an injection of an anti-VEGF drug into the retina every ten weeks by a retinal specialist." (B. Goss Sent. Memo. p. 53.) B. Goss provided a letter from her doctor in Colorado describing her condition. (BG43.) B. Goss' doctor provides no opinion as to the ability of the BOP to provide treatment. T. Goss includes a letter from Dr. Charles Howard, a Former Medical Director, Miami Federal Detention Center, Miami, Florida, to support his claims that the BOP may not be able to provide adequate medical care to T. Goss. Yet Dr. Howard recognizes that T. Goss "may receive the appropriate care" as a CARE4 inmate assigned to a Federal Medical Center. (T. Goss Sent. Memo. p. 19.) As Dr. Howard himself opined in his letter to the Court, T. Goss should be "designated to a Federal Medical Center where medical resources are more readily available than at a mainline institution or Camp. Again, the relatively rapid, timely availability of both Medical and Dental care available at a Medical Center will help keep Mr. Goss ambulatory and functioning while serving his time. This will also allow him to be part of the work cadre there instead of a burden." (See TG-22.) Conversely, the same should be true of B. Goss as well.

In sum, there is no reason to believe that both defendants will not be able to receive adequate care in the BOP. *See United States v. Cutler*, 520 F.3d 136, 172 (2d Cir. 2008) ("In connection with Freedman's heart condition, the government submitted the BOP Health Systems Administrator's statement that the inmates housed and cared for by the BOP include "18,877 with hypertension, 4,016 with hyperlipidemia, 1,926 with carotid artery disease, 4,000 with cardiac disease, 3,465 with arteriosclerotic heart disease, 2,100 with cardiac arrhythmia, and 1,121 with congestive heart failure.") These concerns do not support a variance.

### 2. Government's Argument for Upward Variance

The Government argues that an upward variance for both defendants may be appropriate in their cases. The primary, but not sole, reasons for this request are the nature of the offense, proportionality concerns, and the defendants' lack of remorse for the crimes committed.

### a. Nature of the Offense

The defendants' actions strike at the heart of the honesty of representative government, are a "pervasive corruption of a governmental function resulting in a loss of public confidence in state or local government," and are deserving of serious and severe punishment, including an upward variance. *United States v. Siegelman*, 640 F.3d 1159, 1189 (11th Cir. 2011); *see also United States v. Krause*, 513 Fed. Appx. 482, 486 (6th Cir. 2013) (unpublished)(defendant's "lack of genuine remorse and 'upper echelon' participation in 'wide ranging' public corruption weighed in favor of an above-Guidelines sentence); *United States v. DeLaurentis*, 47 Fed. Appx. 170, 174 (3d Cir. 2002) (unpublished) (the sentencing court did not abuse its discretion in departing upwards because the negative impact of defendant's criminal conduct "caused a loss of public confidence and trust in government"); *see also United States v. Reyes*, 239 F.3d 722, 744–45 (5th Cir. 2001); *United States v. Shenberg*, 89 F.3d 1461, 1476–77 (11th Cir. 1996).

-34-

### b.  Proportionality Concerns

The Government addressed proportionality in the original sentencing memorandum and stands by those arguments.  (Gov. Sent. Memo. pp. 81-83.)  The Government raises the issue again because B. Goss, in her sentencing memorandum, compares herself to Benjamin Burris, who also bribed Senator Hutchinson in a similar manner as the defendants, and who received a 12 month and one day sentence for his criminal conduct.  Consistent with B. Goss's lack of remorse, she believes even this sentence is too much for her because of her good deeds in "caring for others," devoting her career "to improving the quality of life of so many in need" and spending "her retirement volunteering to help those same people."  (B. Goss. Sent. Memo. 54.)

Apart from bribing the same Arkansas Senator, the defendants' conduct stands apart and above Burris' conduct.  The defendants bribed more public officials (at least three), for longer periods of time (years), with greater funds (hundreds of thousands of dollars), and with funds obtained from the Charity for which they worked rather than using their own personal funds. The defendants' sentences should be closer to their co-conspirators *in this case*, rather than an unrelated defendant, and in particular, to the sentences of Senators Woods (220 months) and Hutchinson (96 months total sentence), and their coconspirator Cranford (80 months).  It is appropriate for the Court to consider the codefendants' sentences, and if necessary, upward vary on the sentences imposed on the defendants, to bring them in line with the sentences imposed on other codefendants. *United States v. Vega-Cervantes*, 666 Fed. Appx. 841, 844 (11th Cir. 2016) (unpublished) (the district court did not abuse its discretion in upward varying to impose a 92-month sentence that "was proportionate to other sentences it had imposed in the past for similarly situated defendants.")

### c. Lack of Remorse

Both defendants in their sentencing memorandums make extravagant claims about their motives for committing the crimes for which they pled guilty that show a breathtaking lack of self-awareness and remorse. B. Goss asserts that she simply made a "mistake" in believing and trusting in Cranford, (B. Goss Sent. Memo. pp. 7; 54); that her "motives were not selfish; they were altruistic"; she did not commit the crime to which she pled "to line her own pockets"; but "instead for a good reason" "to continue helping the disadvantaged." (B. Goss Sent. Memo. p. 55.) T. Goss, for his part, asserts that he "was not motivated by greed, but by his desire to help others." (T. Goss Sent. Memo. p. 11.) Nowhere, in both defendants' sentencing memorandums, do they express the slightest bit of remorse for the criminality of their actions, the impact it had on others, or even an acknowledgement of the tremendous harm their actions caused the Charity they both state to care so much about. In fact, the words "sorry," "sorrow," "sorrowful," or "regret" are found nowhere in either B. Goss's or T. Goss's sentencing memorandums, although there is plenty of discussion in both about how the defendants committed their crimes for the "good" of the Charity and the disadvantaged they claimed they sought to help.

Both defendants' assertions that their motives in bribing public officials were not based on any financial gain to themselves ring hollow. While the Government cannot plumb the depths of the human heart to determine what the defendants truly thought, the Government can point to the evidence. Additional revenue to the Charity did bring financial gain to the defendants. During this criminal activity, the salary of both defendants increased until by 2015, the defendants' collective salary was $981,195, not including the separate kickback scheme T. Goss engaged with Cranford.

Of course, the salary and the kickbacks do not include, as voluminously documented and discussed in the Government's original sentencing memorandum, the interest free loans available to the defendants through the Charity, the defendants' use of private charter air flights paid by the Charity to fly back and forth from their home in Colorado, including family members and the defendants' two dogs, the payments by the Charity to the defendants' for-profit management company White Dog Asset Holding (WDAH), charity money used to purchase two homes in Arkansas that the defendants stated were to be their retirement homes, renting back to the Charity rental cars at approximately twice the amount that the defendants had rented them for, and leveraging the Charity's workforce and assets to help the defendants' for profit company, PRO1, with labor and rent for PRO1's warehouse.[10]

Notwithstanding the overwhelming evidence to the contrary, the defendants continue to assert that they did not benefit from these third-party transactions. T. Goss' expert witnesses opines that the structure of these relationships was mutually beneficial to both the Charity and the defendants third-party, for-profit, companies. As the Government's affidavits from IRS Revenue Agents Floyd Sellner and Michelle Ellis state, the Charity funds that the defendants caused to be paid to defendants' for-profit companies were excess benefits, not properly disclosed to the Charity's BOD. Further, the Charity paid approximately $3.3 million dollars over 5 years (2011 through 2015) to lease vehicles, and rent the "Mountain House" and "Lake House," from the defendants' for-profit companies. (*See* Sellner Aff., Attachment D, ¶ 17; Ellis Aff., Attachment E, ¶ 10.)

---

[10] As SA Effland's supplemental affidavit states, the defendants have recently sold their share of PRO1, and have received at least one payment of $17,000,000 for the transaction. (Effland Aff. Attachment C, ¶ 10.)

The defendants' claims that they compromised the integrity of our democratic institutions, while lining their own pockets, to do "good," reflects a stunning lack of remorse. It is well established that a lack of remorse can support an upward variance from the guidelines. *See United States v. Overbey*, 696 F.3d 702, 706 (8th Cir. 2012) (affirming upward variance based on defendant's lack of remorse); *see also United States v. Broxmeyer*, 699 F.3d 265, 295 (2nd Cir. 2012) (same); *United States v. Douglas*, 569 F.3d 523, 527–28 (5th Cir. 2009) (same). The Government wishes to make clear that it seeks an upward variance in this case, if necessary, only up to 48 months for B. Goss and a 96-month sentence for T. Goss, which the government submits are appropriate sentences for the defendants.

## II. CONCLUSION

The defendants' actions in corrupting the legislative process in Arkansas for their own benefit requires a serious punishment. Based on the factors stated in 18 U.S.C. § 3553, the Government requests this Court impose a total sentence of 96 months and a $350,000 fine for Tom Goss as fair and just under the circumstances of his case. The Government further requests a total sentence of 48 months and a $250,000 fine for Bontiea Goss as fair and just under the circumstances of her case. Finally, the Government, requests this Court require the defendants to pay, jointly and severally, restitution and forfeiture in a combined total amount of $4,350,000, consistent with this Reply Memorandum.

Respectfully submitted,

TERESA A. MOORE
United States Attorney
Western District of Missouri

By /s/ Randall D. Eggert
Randall D. Eggert
Assistant U.S. Attorney
Missouri Bar No. 39404

By /s/ Stephanie Mazzanti
Stephanie Mazzanti
Special Assistant U.S. Attorney
Arkansas Bar No. 2006298

United States Attorney's Office
Western District of Missouri
901 E. St. Louis Street
Suite 500
Springfield, Missouri 65806
(417) 831-4406

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S. Department of Justice

By /s/ Marco A. Palmieri
Marco A. Palmieri
Acting Deputy Chief
D.C. Bar No. 981788

By /s/ Jacob R. Steiner
Jacob R. Steiner
Trial Attorney
CA Bar No. 325239

United States Department of Justice
Criminal Division
Public Integrity Section
1301 New York Ave., NW
Washington, DC 20004
(202) 514-1412

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of the foregoing was delivered on April 17, 2024, to the CM/ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

/s/ *Randall D. Eggert*
Randall D. Eggert
Assistant United States Attorney

# EXHIBITS 215-222

Originals maintained in the Clerk's Office

Please see "Notice of Exhibit Attachment"